## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **ELVIS RAMON GREEN BERRIOS**<br><br>PLAINTIFF<br><br>V.<br><br>**SIG SAUER, INC.**<br><br>DEFENDANTS | CIVIL ACTION:<br><br><br><br>JURY TRAIL DEMANDED |

### COMPLAINT AND DEMAND FOR JURY TRIAL

**TO THE HONORABLE COURT:**

**COME NOW** Plaintiffs, **Elvis Ramon Green Berrios,** through their undersigned counsels, and respectfully states, alleges and prays:

### I.  THE PARTIES

1. Plaintiffs, **Elvis Ramon Green Berrios** (further referred to as Elvis)**,** is of legal age, single, with domicile and residence in Barranquitas, Puerto Rico, State Road 143, kilometer 2 hectometer 7. Elvis is 32 years old gentleman that has been a police officer for the last 20 years, he is allowed to carry weapons concealed or unconcealed and has substantial firearms experience. He has suffered severe, permanent physical injury and disfigurement as a direct and proximate result of the negligence and breach of warranties and deceptive marketing practices of SIG.

2. Defendant, Sig Sauer, Inc. is a foreign profit corporation with a principal office address of 72 Pease Boulevard, Newington, New Hampshire 03801. SIG Sauer, Inc. (further referred to as SIG) is a Delaware corporation that designs and manufactures firearms for military and commercial (law enforcement and

civilians) markets throughout the United States, and internationally. It markets and sells its products directly and through dealers. SIG was formerly known as SIGARMS, Inc. and changed its name to SIG Sauer, Inc. in October 2007.

3. Co-Defendant, fictitious Insurance Company X whose identity is presently unknown, who upon information or belief is an insurance company organized and existing under the laws of the Commonwealth of Puerto Rico who insured the defendant and is jointly and severally responsible for the damages claimed herein pursuant to section 20.03 of the Insurance Code of PR, Title 26, Annotated Laws of Puerto Rico.

## II.   NATURE OF THE ACTION JURISDICTION AND VENUE

4. This action seeks actual, compensatory, and damages, and equitable relief, relating to defendant SIG Sauer, Inc.'s negligence, defective design, breach of warranties and unfair and deceptive marketing practices regarding a semi-automatic gun. Specifically, a striker-fired, semi-automatic pistol known as the "P320" that has fired, without trigger pulls, on numerous civilians and law enforcement agents across the nation for the last five years at least. Elvis never before had any incidental, accidental or casual self-firing of his P320 pistol prior to the incident.

5. Elvis, a resident of Puerto Rico, was assigned a 9mm caliber SIG Sauer P320 (Serial Number 58H014298) on his police officer job, years before the incident. The pistol was carried by Elvis inside a plastic holster manufactured by SIG and designed for the P320.

6. On the night of January 6, 2021, he was carrying his P320 in a SIG-manufactured, inside his pants in the waistband plastic holster while returning home. When he proceeded to remove the holster from inside his waist the pistol fired a round.

7. As soon as he took hold of the holster at his waistband inside his pants, the P320 fired and hit him in his right thigh without him ever touching the trigger that was totally covered by the plastic holster. The bullet it discharged left a 2 gaping wound in his thigh, caused nerve damage, broke his femur, left an horrendous scar and left the holster broken and melted at the barrel area.

8. At that moment Elvis was alone in the living room area at home, he fell to the ground and lost consciousness, later he woke up at the ER in Rio Piedras medical Center. His father was asleep in his room at home, when he heard the gun shot he came to the living room and found Elvis unconscious and covered in blood. He then called 911.

9. Among other things historical problems with the trigger assembly of the P320, finding that the gun went off "inside the holster," as stated by plaintiff Elvis.

10. Elvis' P320 should not have discharged without the trigger being pulled, holstered or un-holstered. In its "Safety Without Compromise" marketing materials for the P320, SIG states:

  *"SAFETY WOTHOUT COMPROMISE*

*We've designed safety elements into every necessary feature on this pistol. From the trigger, to the striker and even the magazine, the P230 won't fire unless you want it to."*

11. Despite this warranty, which SIG has made for the last several years to the present day, the weapon fired without the trigger being pulled. SIG, further, illegally attempted to modify and/or disclaim the warranty after Elvis' possession years ago by means of: (i) a benign-sounding "Voluntary Upgrade Program" announced in August 2017 discussed below, and (ii) substantial changes to the P320 product manual describing what events can make the gun fire without a trigger pull, including "vibration."

12. Despite clear evidence of serious safety issues with the P320, as demonstrated by the Voluntary Upgrade Program and warranty modifications, SIG nevertheless continued to affirm the safety of the P320 as originally designed. This is the version that fired on, and hit, Elvis without a trigger pull on January 6, 2021 simply when he moved the holster it was in:

> **SIG SAUER, Inc. – P230 Voluntary Upgrade Program.**
>
> **Is my P230 safe in its configuration?**
>
> **Yes. The P230 meets and exceeds all US safety standards. However, mechanical safeties are designed to augment, not replace safe handling practices. Careless and improper handling of any firearm can result in an unintentional discharge."**

13. The Court has federal question jurisdiction over the case. It involves a claim under the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 et seq. The Court has supplemental jurisdiction over Elvis' state law claims pursuant to 28 U.S.C. § 1367(a) because they are so related to the federal claim that they form part of the same case or controversy under Article III of the United States Constitution and this Honorable Court has jurisdiction over the parties and the subject matter of this litigation under and pursuant to Section 1332 of Title 28 of the United States Code, 28 U.S.C. §1332, inasmuch as there is complete diversity of citizenship between the Plaintiffs and the Defendants and the amount in controversy, exclusive of costs and interest, exceeds the amount of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00).

14. Pursuant to pursuant to 28 U.S.C. §1367, this Court has supplemental jurisdiction over state claims under Article 1542, 1543 and 1544, of the Puerto Rico Civil Code.

15. Venue is proper in this Court pursuant to Section 1391 of Title 28 of the United States Code, 28 U.S.C. §1391, because the claims asserted arose in this judicial district.

16. Plaintiffs request a jury trial for all issues so triable.

### III. FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

17. On the night of January 6, 2021, Elvis was carrying his P320 in an inside plastic holster designed for the P320 SIG, inside-the-waistband holster when he came home from a family reunion. Upon returning home, he began to remove the holster from his waist with the firearm still fully seated in the holster.

18. As soon as he took hold of the holster and moved it, the P320 fired and hit him in his right thigh without the trigger being touched or pulled.

5

19. The bullet it discharged left a 2 gaping wound in his thigh, caused nerve damage, broke his femur, left a horrendous scar and left the holster broken and melted at the barrel area.

20. His father, Ramon Green Ortiz, was at home asleep, and he rescued Elvis and called 911.

21. The Later the police noted, among other things, historical problems with the trigger assembly of the P320, finding that the firearm went off "inside the holster," as stated by plaintiff Elvis.

22. The police further noted that "there is no reason or evidence to suggest that [Elvis] negligently [or] purposely discharged the firearm into his own leg."

23. The incident has resulted in physical harm and related trauma to Elvis, was administered a surplus of blood supplies due to his significant loss of blood, he was hospitalized for 20 days, immobilized for weeks, given pain-killing narcotics to deal with the injury and function on a day-to-day basis. Elvis has been surgically intervened for at least 6 times due to the injuries. He was submitted to a surgery to insert a metal bar in his femur, a right leg "fasciotomy" and a bypass in his right leg. (see medical records).

24. He has been in surgery for at least 6 times, the last this month of December 2021.

25. He continues to be prescribed a significant amount of sleep medications, and frequently wakes up sweating with night terrors about the incident and the wound itself. He has suffered numbness, maceration of leg tissue and muscle, and remnants of the discharged bullet in his leg.

26. SIG'S Marketing of the P320 Pistol 18. Years before the incident occurred in January 2021, through and including the date of Elvis' assignment of the pistol, SIG expressly warranted that the weapon could not fire without a trigger pull. The safety propaganda indicates that:

> **"SAFETY WITHOUT COMPROMISE**
>
> **We've designed safety elements into every necessary feature on this pistol. From the trigger, to the striker and even the magazine, the P230 won't fire unless you want it to."**

27. In additional marketing material, under the heading "Striker Safety," SIG further states: the Striker Safety "[p]revents the striker from being released unless the trigger is pulled":

> **"STRIKER SAFETY: Prevents the striker from releasing unless the trigger is pulled."**

28. At the same time, SIG SAUER contradictorily warned in the original owner's manual for the P320, on page 25, that the weapon could fire if dropped without the trigger being pulled. Specifically, that it could fire if a round were chambered, i.e., inside the firing chamber of the weapon's slide when incurring an impact from the ground:

> **"WARNING – DROPPED PISTOL**
>
> **If dropped, the pistol may fire. Keep the chamber empty unless actually firing.**

*ANY FIREARM MAY FIRE IF DROPPED.*"

29. Despite this warning, SIG expressly warranted not just that the P320 could not fire without a trigger pull, but that it **could not fire if dropped**, in marketing documents regarding the P320. The company was therefore stating two opposite things about the safety features of the P320, or lack thereof, at the same time

> *"SAFETY WITHOUT COMPROMISE.*
>
> *Safety ins't negotiable. The P230 maximizes peace of mind with a robust safety system. Never again will you need to pull the trigger to disassemble your pistol. And, while available as an option, you won't need a tabbed trigger safety for your gun to be dropped safe."*

30. Upon information and belief, it is standard operating procedure for all Puerto Rico Police, U.S. law enforcement agencies, including the United States Secret Service, the Federal Bureau of Investigation, the Bureau of Alcohol, Tobacco, Firearms and Explosives, as well as local and state police departments, to carry pistols with a chambered round. SIG was fully aware of this fact at the time it sold any and all P320 pistols to the public and to government based law enforcement agencies and departments.

31. It is widespread practice among civilians who conceal carry their pistols to have a round in the chamber. This practice does not violate black letter rules of firearm safety, as pistols should not be vulnerable to un-commanded discharges under any circumstances.

32. SIG was aware of the facts described in previous paragraphs of this complaint, when it designed and manufactured the P320 in 2014 or earlier, and left the pistol in the market.

33. SIG's advertising regarding the P320 has alarmed and worried the law-enforcement lineage of their firearms and focuses on highlighting the military/police usage, the modularity, the safety, and the functionality to everyone.

34. In the marketing materials of the company, SIG advertised that the P320 would function in a safe manner. These representations contained within SIG's advertisements, packaging, package inserts and website, and they were also delivered to retailers in the form of marketing materials and specifications which were reprinted verbatim and made available to consumers.

35. The advertising and continued claims of safety, led the Police Department of Puerto Rico to acquire and assign to Elvis and others, the P320 to Elvis without knowledge of its dangers.

36. Since the condition manifested, SIG had a duty to disclose that the P320 had a substantial dangerous safety defect.

37. Instead of disclosing its safety defects in numerous marketing materials – or on the packaging of the P320 – Sig decided to conceal and hide them from users such as Elvis, causing them and him to carry and use the P320 when he otherwise would not have.

38. The Design of the P320 and August 2017 notified the "Voluntary Upgrade Program" for the P320 is the first striker-fired pistol SIG ever manufactured.

39. SIG assembled it using the same frame and fire control unit from an earlier hammer-fired SIG model, the P250.

40. A striker-fired pistol is different from the traditional "hammer-fired" pistol. It contains no external hammer to be pulled back by the user to cock the gun.

41. Rather, an internal "striker" is held back under spring pressure inside the gun like a crossbow. Once the slide is racked backward, the weapon is internally cocked and ready to fire and in "condition red" or "duty ready" condition. The striker is now under significant spring tension to move forward to impact the round's primer to fire the bullet, and is held back only by the weapon's sear. See Ex. I.

42. It is known that in early 2016, while competing for a $580,000,000 contract to supply the United States Army with a new service pistol in 2016, SIG's prototype P320s exhibited 200 malfunctions or more during Army testing. These defects included failure to eject spent casings, firing upon impact with the ground, and not firing. In or around April 2016, the Department of Defense (DOD) notified SIG of many malfunctions with the P320. It demanded that SIG fix all design problems associated with the P320.

43. In early 2016, SIG was also warned by a Florida police department, and others, that the P320 was capable of firing without a trigger pull.

44. SIG decided not to tell and did not tell the public about the 2016 DOD and other law enforcement agency warnings about defects with the P320.

45. As early as 2016, if not years before, members of SIG's management and design teams began investigating defective discharge events.

46. These investigations involved SIG employees visiting local law enforcement agencies reporting defective discharge events, and taking the weapons to New Hampshire for in-house "testing." These tests typically consisted of firing rounds through the weapon at issue and declaring it to be fine. In each case, this in-house testing destroyed the integrity of the weapon in its immediate post-accident condition.

47. However, rather than seek to learn the real facts and details surrounding the dangerous propensity of the P320 firearm to fire un-commanded, SIG's upper-level management actively avoided learning the details of defective discharge events. It instead worked, where possible, with some law enforcement departments to theorize implausible reasons why P320s were discharging without trigger pulls, including that "keys," "artifacts," "seatbelt buckles," and clothing articles, among others, were getting into the holsters and pulling the triggers.

48. In one email exchange, for example between a SIG in-house lawyer and a Roscommon, Michigan, law enforcement agent in 2016, the SIG lawyer recounts a patrol officer stating on a body cam video (after a defective discharge inside a patrol car): "[T]ell me how a gun would fire still in the holster." The lawyer also

states in the email that he told a sergeant of the Roscommon Department that he "did not want to see anything they did not want me to see.".

49. After relating in the email that the P320 at issue discharged simply when the officer "started to stand" to get out of his car, SIG's in-house lawyer noted that the empty casing of the discharged round had not ejected, as it should have. SIG and/or the Roscommon Department later claimed that a "seat belt buckle" somehow found its way inside the officer's holster, got inside the weapon's trigger guard, wrapped itself around the trigger, and pulled the trigger.

50. However, the body cam video shows the seat belt buckle in its normal retracted position in four separate frames. The officer in question, moreover, was not wearing his seatbelt at the time of the discharge, and at no time blames it for causing the discharge. He instead expresses shock and disbelief that the weapon fired in the holster merely when he moved to get out of the car:

> *"OFFICER: [Officer rises to exit car, gunshot] What the hell? You explain to me how a gun goes off getting out of the car.*
>
> *2D OFFICER: Huh. What?*
>
> *OFFICER: Yea. Holy s***.*
>
> *2D OFFICER: No s***.*
>
> *OFFICER: Holy s***.*
>
> *2D OFFICER: Scare the s*** out of you huh?*

*OFFICER: Something hit my leg. I don't know if I'm shot or what but you're my witness man. I'm glad I got a witness. Look at that you tell me how that goes off?*

*2D OFFICER: I don't know man. That's bizarre. You were just standing up and it went off.*

*OFFICER: Yea, I was just getting out of the car.*

*2D OFFICER: Good thing it didn't get your fr***** or hand. I'm not a big fan of Glocks.*

*OFFICER: It's not a Glock it's a SIG.*

*2D OFFICER: Oh, it is.*

*OFFICER: I am going to take this out and unload the damn thing. It even wrapped another one in. Oh no, it didn't. That's a discharged round.*

*OFFICER: Can I get your name?*

*2D OFFICER: Yea.*

*OFFICER: Whoa. That could have ruined my whole goddamned day. Imagine explaining that to the sheriff.*

*2D OFFICER: Yea. OFFICER: I'm so glad you're here man.*

*OFFICER: Can you imagine having to explain that to the sheriff.*

*2D OFFICER: Did you get a concussion.*

*OFFICER: Yeah, I got a sting. Well it blew bottom of holster out of something black went flying out.*

*OFFICER: Well at least I got my bodycam.*

*2D OFFICER: That surprised me.*

*OFFICER: You thought you were surprised. God\*\*\*\*.*

*2D OFFICER: I've always worried about that.*

*OFFICER: Glad nobody got hurt.*

*OFFICER: I just for the life of me can't figure out how that went off.*

*2D OFFICER: Yea, because there's no, uh, your seatbelt wouldn't have hit that.*

*OFFICER: No, the trigger was completely covered. I don't know. I honestly don't know. Like I said, I'm glad you're my witness. I'm going home and have a beer.*

*2D OFFICER: I would too.*

*OFFICER: Thanks man."*

51. The contradictions between SIG's public representations that the P320 was safe, and its private knowledge that it was not, showed a conscious disregard for the lives and safety of 15 members of the public and law enforcement officers. At all times relevant to this Complaint, SIG employed a skillful public relations campaign, internet marketing, and in-person reassurances of the P320's alleged safety to end users, which was designed to maximize revenue at the expense of human safety.

14

52. While and most likely before competing for the $585,000,000 Army contract in 2016 and 2017, SIG privately struggled, unsuccessfully, to find an engineering re-design solution that would prevent the commercial version of the P320 from unintentionally firing on civilians and law enforcement officers without trigger pulls, even upon mere rotational movement of the human body.

53. On August 4, 2017, a Stamford, Connecticut, SWAT officer sued SIG in United States District Court for the District of Connecticut for damages relating to a drop fire that shot him in the knee when his holstered P320 fell from a distance of less than three feet and fired. The Stamford discharge resulted in a flood of national negative media publicity and attention regarding the safety of the P320, including television and the internet. 46. Four days later, SIG issued a press release stating that the P320 could fire without a trigger pull under certain conditions, including vibration, but "reaffirmed" the safety of the P320 to all end users:

> *"All SIG SAUER pistols incorporate effective mechanical safeties to ensure they only fire when trigger is pressed. However, like any mechanical device, exposure to acute conditions (e.g. shock, vibration, heavy or repeated drops) may have a negative effect on these safety mechanisms and cause them to not work as designed. This language is common to owner's manuals of major handgun manufacturers."*
>
> *SIG SAUER PRESS RELEASE. Ex. II*

15

54. SIG's claim was inaccurate and intentionally misleading because its new warnings regarding the capability of the P320 to fire without a trigger pull, upon "shock" or "vibration," were not "common to owner's manuals of major handgun manufacturers.".

55. SIG announced a Voluntary Upgrade Program, on August 14, 2017, for the P320. The VU Program was created for the stated purpose of "reduc[ing] the physical weight of the trigger, sear, and striker while additionally adding a mechanical "disconnector," allegedly to simply make the P320 "better" than it already was. Many of these design changes to the P320, as SIG stated, had "nothing to do with drop safety".

56. In reality, SIG's VU Program was intended to re-design and correct the defective firing control unit within several hundred thousand P320s without admitting it. To protect its corporate image, SIG continued to deny, both to law enforcement and the general public, any dangers in the original "non-upgraded" P320 such as the one that shot Elvis in January 2021. SIG maintained that the P320 would not fire if its safeties were "fully functional" and were "without broken or missing parts".

57. Indeed, at the time the VU Program was announced, SIG had just recently obtained the $585,000,000 Army contract. A mandatory recall under these circumstances would have been a public relations disaster for the company, cost

tens if not hundreds of millions of dollars in mandatory recall expenses, and would have caused irreparable damages to its brand.

58. In the words of SIG, these VU Program changes represented an "alternate design" of the P320. SIG declined to label the VU Program a "recall" and expressly stated that all P320s in circulation were safe.

59. Consistent with most consumer returns, only about 20% of P320 owners ever mailed their guns back for the "upgrades," thus saving SIG tens of millions of dollars in labor, parts and shipping, and leaving hundreds of thousands of dangerous P320s still in circulation in the United States.

60. In fact, when the VU Program was announced in August 2017, days after the Stamford federal lawsuit, SIG had actual knowledge of numerous defects with the firing control unit in the P320 for approximately two years, if not longer.

61. On May 10, 2017, the DOD submitted an urgent Engineering Change Proposal for the prototype of the military version of the P320. Though couched as a product "improvement to enhance performance," the Proposal demanded that the P320's internal firing control unit be replaced, including the receiver subassembly, the sear group subassembly, the trigger, the sear, the striker subassembly, and the firing pin striker. SIG complied and made all requested engineering changes.

62. However, to save approximately $50-100 million in recall expenses, it assured end users of approximately 500,000 commercial versions of the P320, in the hands of Puerto Rico Police Department and United States law enforcement

agents and civilians, including Elvis, that they were all still safe, thereby exposing him and others to severe bodily harm, emotional trauma, and sudden death.

63. SIG has never recalled the P320 despite having recalled other of its products known to have defects. SIG's former German parent company, SIG GMBH, took the benefit of $35 million in financial losses relating to the VU program, describing it in tax filings with the German government as a "recall" in America, illustrating the deceptive nature of the VU Program.

64. Then the P320 Manual Changes and approximately eight months after January 2017, when the Connecticut SWAT member was shot, SIG removed the warning on page 25 from the user manual regarding a chambered round, and replaced it with the following dramatically different language:

> **"All SIG SAUER pistols incorporate effective mechanical safeties to ensure they only fire when the trigger is pressed. However, like any mechanical device, exposure to acute conditions (e.g. shock, vibration, heavy or repeated drops) may have a negative effect on these safety mechanisms and cause them to fail to work as designed. After suspected exposure to these conditions, have the firearm checked by a certified armorer before using. Mechanical safeties are designed to augment, and not replace safe handling**

*practices. **Careless and improper handling of any firearm***

***can result in unintentional discharge."***

65. SIG had never before represented that mere "vibration" or "shock" could cause the weapon to discharge; this statement was irreconcilable with its original warranty that the weapon would only fire if the trigger was pulled.

66. SIG had also expressly represented since the P320's manufacture and distribution into the stream of commerce in 2014 that the weapon possessed a "robust safety system."

67. In fact, SIG's original design and manufacture of the P320 in 2014, or earlier, rendered the weapon unreasonably dangerous for its intended uses, and for any foreseeable uses and accidents involving its intended uses, including any normal carrying, holstering, un-holstering, or rough handling in any altercation or combat, at the time Elvis was assigned and had possession of his P320.

68. Specifically, it possessed an inadequate sear-striker connection, even after implementing a "voluntary upgrade" program for the gun, an inadequate internal striker safety, too much horizontal and vertical "play" between internal parts inside the slide, a slide cap that was too long, and lacked any external or tabbed trigger safety.

69. Other Substantially Similar or Identical Defective Discharges of the P320, such as before it introduced the P320 into the stream of commerce in the United States

in 2014, SIG was aware of defective discharges without a trigger pull, many of which pre-dated the date of assignment of the pistol to Elvis.

70. Upon information and belief, there have been many prior incidents of defective discharges involving the P320 that have discharged without the trigger being pulled (whether involving the P320 in its original configuration, or the re-designed or "upgraded" version). The P320 has defectively discharged (both while in battery and out-of-battery) while the weapon was merely being handled, moved, while it was being holstered or un-holstered, and when the weapon was accidentally dropped.

71. Other events, for example, in February of 2016, a fully-holstered P320 discharged without a trigger pull inside a Roscommon, Michigan police officer's vehicle when the officer moved to exit the vehicle during a snowstorm. The incident was captured on the officer's body cam video and shows that no object entered his holster at any time.

72. In 2016, the Surprise, Arizona, police department complained to SIG of two separate incidents of P320s firing without trigger pulls.

73. Despite outstanding discovery requests in a civil action against SIG regarding defects with the P320 in the United States District Court for the Eastern District of Virginia in 2018, Vadnais v. SIG Sauer, Inc., 1:18-cv-00540 (EDVA 2018), these three incidents described in Paragraphs of this complaint herein were not disclosed by SIG, until the last day of discovery.

74. In October of 2016, a P320 fired un-commanded on retired NYPD officer Thomas Frankenberry in South Carolina, severely injuring him. The spent casing did not eject.

75. In November of 2016, a P320 fired un-commanded on an officer in Holmes Beach, Florida, striking him in his leg.

76. In 2017, a sheriff's deputy in Michigan accidentally discharged a SIG Sauer pistol, striking a schoolteacher in the neck.

77. On January 5, 2017, a P320 shot a Stamford SWAT team member in his left knee when the pistol fell from a distance of less than three feet to the ground while fully holstered, refuting SIG's express representations that the weapon is drop safe, cannot fire without a trigger pull, and does not require a safety to be drop safe.

78. On February 28, 2017, a P320 accidentally discharged while in use by the University of Cincinnati Police Department.

79. On June 14, 2017, a P320 accidentally discharged in Wilsonville, Oregon.

80. On June 20, 2017, a P320 accidentally discharged while in use by the Howell Township, NJ, Police Department.

81. In June 2017, SIG shipped approximately 800 P320s to the Loudoun County Sheriff's Department in Virginia, privately assuring Sheriff David Chapman that the by then known problems with the weapon would be fixed, but stating that for the time being it had to deal with the weapon as currently manufactured and

designed. Three P320s within this shipment later fired without trigger pulls on three deputy sheriffs, severely injuring them.

82. On July 28, 2017, a P320 accidentally discharged in Tarrant County, Texas.

83. On August 7, 2017, SIG's CEO, Ron Cohen, stated in a press release that: "there have been zero (0) reported drop-related P320 incidents in the U.S. Commercial market." This statement was not true. In fact, at the time it was issued, SIG had direct knowledge that Officer Vincent Sheperis in Connecticut had been shot by a drop fire with the commercial version of the P320 approximately eight months earlier, as well as several other defective discharges of the P320 before that date.

84. As noted, on August 8, 2017, SIG announced a "voluntary upgrade" program for the P320 pistol, stating that the pistol meets "rigorous testing protocols for global military and law enforcement agencies" and all "U.S. standards for safety."

85. This statement was also false and intentionally misleading as there are no United States federal government standards for gun safety, a fact well known to SIG when it issued this press release.

86. SIG's VU program, as noted, was presented to the public as purely optional, not urgent, and not mandatory, offering to make existing commercial versions of the P320 "better" by installing a much lighter trigger, an internal disconnector component, and an improved sear to prevent accidental discharges

87. On August 9, 2017, the police chief of Morrow, Georgia, issued an emergency order removing the P320 from service.

88. In October of 2017, a P320 accidentally discharged in Georgia when an officer fell to the ground in pursuit of a suspect. His weapon was holstered and fired simply when he struck the ground.

89. On November 12, 2017, a P320 accidentally discharged in Tyler, Texas.

90. In January 2018, upon information and belief, a P320 accidentally discharged in Dallas County, Texas.

91. On February 7, 2018, Loudoun County, Virginia, deputy sheriff Marcie Vadnais's P320 fired on her un-commanded severing her right femur causing catastrophic skeletal injury, deformity, four general anesthesia surgeries, severe emotional distress, and related trauma, ending her career. Upon CAT scanning her P320, it was found to have both a product and manufacturing defect: crossed sear springs that apply upward spring pressure to the sear to keep it from releasing the striker.

92. Months later in April of 2018, SIG issued a second "voluntary upgrade" notice to all users or owners of the P320, but still did not recall the weapon.

93. In May of 2018, civilian Gunter Walker reported to SIG that his P320 fired on him uncommanded when he placed the weapon down on his nightstand, shooting him through the palm of his left hand.

94. In June of 2018, a Williams County, Ohio, officer reported that his P320 discharged twice in one moment as he was merely attempting to move the slide backward. One round grazed the officer's arm; the other blew through his patrol car's driver's side door.

23

95. In May 2018, a Rancho Cucamonga, California, officer reported that his "upgraded" P320 fired un-commanded while he was merely walking inside his department locker room; the casing of the round did not eject.

96. In October of 2018, a P320 fired un-commanded on Lieutenant Letrell Hayes in Georgia while he was holstering it, causing severe tunneling injuries to his right thigh and calf.

97. In October of 2018, firearms expert and retired law enforcement officer Stephen Mayes' P320 fired on him un-commanded while seated in its holster, causing severe injury to his right leg.

98. In December of 2018, civilian Robert Lang's P320 fired on him un-commanded, causing severe tunneling wounds to his right leg.

99. On May 19, 2019, the upgraded P320 of Lieutenant Thomas Ahern of the Cambridge, Massachusetts, SWAT team fired un-commanded inside a SWAT van with six other occupants while he was working a shift for the annual Mayfair event near Harvard Square. The round struck a metal plate affixed to his cellphone case, deflected into a SWAT gear bag, and came to rest in a ballistic helmet, narrowly missing everyone. The casing of the round did not eject. Lieutenant Ahern is a SIG-certified armorer on the P320 with significant weapons experience.

100. On July 23, 2019, an upgraded P320 fired un-commanded on Officer Walter Collette, Jr. of the Somerville, Massachusetts, police department, hitting him in his leg and causing substantial injuries to his leg. The next day, an

upgraded P320 fired un-commanded on a Homeland Security Agent at a firing range in the Bronx, New York.

101.    In August of 2019, a Philadelphia transit officer's upgraded P320 fired un-commanded while fully-holstered, nearly striking a bystander in the subway. The incident was captured on video, it shows an "upgraded" P320 firing without the gun ever being touched and seated inside its holster. The officer involved, who noted that the round almost hit a bystander, was returned to duty the next day fully exonerated and with no discipline.

102.    The Philadelphia transit authority replaced all SIG P320s, and later fully exonerated the officer of any alleged wrongdoing in view of the content of the videotape of the incident showing that it fired without a trigger pull. The officer, Craig Jacklyn, later stated: "This weapon is a hazard. I actually spoke with a lawyer for my situation. Although no one was hurt...someone could have been killed. I'm angry that I was put in a potentially life altering position with a product deemed "safe" by its manufacturer. The fact that officers are carrying this weapon on the job and at home around family thinking it's safe even while resting in its holster has me very angry. Everything that I've told you is documented through 2 Investigative Services . . . Philadelphia Police Firearms Investigative Unit/ Officer Involved Shooting Incident Unit and SEPTA Transit Police Criminal Investigations Unit. There is station video footage/ body worn camera footage as well."

103.    On September 3, 2019, another upgraded and re-designed P320 in use by the Loudoun County, Virginia, sheriff's office fired un-commanded on another Loudoun County deputy sheriff, Carl Costello, hitting him in his leg.

104.    On October 10, 2019, Officer Jacques Desrosiers, also of the Cambridge, Massachusetts, police department, was shot by his P320 without a trigger pull. The round caused massive and life-changing injuries to Officer Desrosiers. The spent casing of the round did not eject.

105.    On October 11, 2019, a P320 fired un-commanded on Veterans Affairs police officer Frank J. Kneski, striking him beneath his lower back as he was un-holstering the weapon. Upon inspection it was found that the spent casing did not eject.

106.    The Kneski discharge was investigated by Major Peter J. Villani of the United States Veterans Affairs police agency, also a SIG-certified armorer. In his report, he noted the following: After reviewing the Officer's sidearm, it was noted that the P-320 came from Sig Sauer to the distributor prior to the point of sale already with the "upgrade" completed. The sidearm had approximately 100 rounds through it since purchased. Upon further examination of the internal parts of the frame module, I noticed that the foot of the striker that catches the [sear] has noticeable side to side and up and down movement within its channel along with upward movement of the slide from the frame. Also, the edge of the striker foot which has a height thickness of approximately 2mm, is only making contact with approximately .25 of a mm of the leading edge only of the disconnector

hook. Since the striker has been changed with a lighter weight version during the "upgrade program", it is quite possible that any abrupt movement or twisting of the P-320 while holstered, could cause the foot of the striker to disengage itself from the disconnector hook on its own since there is so little contact between the striker foot and the [sear].

107.     On November 9, 2019, a P320 fired un-commanded on Officer Matthew Gardette of the Manteca, California police department as he was getting ready for work. As he merely attempted to place and fasten his duty belt around his waist, the P320 discharged inside the holster. 101. The holster was a Safariland level three holster with the hood cover up securing the pistol. The round blew out the bottom of the holster, impacted the locker room floor, and missed both Officer Gardette and a fellow officer by inches as it ricocheted into a locker door.

108.     On December 2, 2019, a P320 fired un-commanded while in the possession of Detective David Albert, also of the Cambridge, Massachusetts, police department, as he was in the process of putting his duty belt on.

109.     In June of 2020, a P320 fired un-commanded on a Pasco County, Florida officer, severely wounding him in his right leg. This incident was the third un-commanded discharge experienced by Pasco County officers since 2019.

110.     In June of 2020, a P320 fired un-commanded on a civilian in Missouri while fully seated in its holster, causing substantial damage to the holster and resulting in a broken bone to the civilian's foot.

111.     Upon information and belief, employees at SIG's own training academy in New Hampshire have knowledge of defective discharges causing injury that occurred in both 2016 and 2017.

112.     In an interview in 2013, just before the P320 came to market, SIG's former Chief Financial Officer, Timothy Scullin, noted that SIG's revenue had risen approximately 1,400 percent from 2012 to 2013. He further stated that Sig Sauer's growth had outpaced the firearms' industry's growth by "two or three times." When asked what were some of the biggest professional challenges in his career with SIG, CFO Scullin stated: At SIG, to grow this fast, people get really challenged. When you're growing 70 to 80 percent in a year, all the systems get stretched, and the people really get stretched. You have to be able to manage multiple tasks in a very fast environment, and in an environment that's highly regulated, so you can't mess up, otherwise you get shut down. It just creates a tremendous amount of stress on the people in the system. But we've got people that have risen to the challenge.

113.     Upon information and belief, the "stress" Scullin noted on SIG's employees included verbal and even physical harassment to get product "out the door" as quickly as possible regardless of quality control and safety concerns.

## COUNT I

## VOILATION OF THE MAGNUSON-MOSS WARRANTY ACT, 15 U.S.C. Sec. 2308 (a))

114.     Elvis incorporates the preceding allegations by reference.

115.     The SIG P320 is a consumer product as defined in 15 U.S.C. § 2301(1).

116.     Plaintiff Elvis is a consumer as defined in 15 U.S.C. § 2301(3).

117.     At all relevant times, SIG was a supplier and warrantor as defined in 15 U.S.C. § 2301(4) and (5). 112. In connection with the possession of the P320 Elvis as assigned to him, SIG issued written warranties as defined in 15 U.S.C. § 2301(6), which expressly warranted that the P320 would not fire un-commanded, i.e., without a trigger pull. In fact, Elvis' P320 was capable of firing, and did fire, without a trigger pull (while inside the holster), contrary to SIG's warranties.

118.     SIG breached the express warranties it made to Elvis stating the P320 was safe for its intended and foreseeable uses and particular purposes.

119.     After Elvis' assignment of the P320, SIG attempted to modify and/or disclaim the warranties it had made regarding the safety of the pistol by stating that "vibration," among other factors, could make the P320 fire without a trigger pull.

120.     SIG's attempt to modify and/or disclaim its prior warranties regarding the safety of the P320, time after Elvis' assigment, violated section 2308(a) of the Magnuson   Moss Warranty Act (the Act).

121.     SIG's violation of the Act has been the direct and proximate cause of substantial economic and non-economic damages incurred by Elvis.

**COUNT II**

NEGLIGENCE (ARTICLES 1542, 1543 AND 1544, OF PUERTO RICO CIVIL CODE).

122.     Elvis readopts and re-alleges all of the preceding paragraphs of this pleading as if fully set forth herein.

123.     At all relevant times, SIG owed Elvis the duty to exercise reasonable care in designing the P320 weapon before selling the gun and placing it into the stream of commerce, so as to prevent the gun from firing upon him merely moving his holster.

124.     At all relevant times, SIG owed Elvis the duty to manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing inside a holster, where the trigger cannot be pulled, before selling the gun and placing it into the stream of commerce.

125.     At all relevant times, SIG owed a duty to unambiguously warn consumers and/or intended users of the P320, including Elvis, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use.

126.     Upon information and belief, SIG knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other 31 sources of information to be developed in discovery, long before one of its P320s shot Elvis in January 2021.

127.     SIG breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts: i. By failing to use due care in designing and manufacturing the P320's firing and striker assembly so as to prevent un-commanded discharges; ii. By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, so as to prevent un-commanded

discharges; iii. By failing to issue a mandatory recall of the P320 as SIG had done in the past with other defective products; iv. By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded as described above; v. By negligently failing to unambiguously warn purchasers and end users of the gun, including Elvis, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, which it knew or should have known through the exercise of ordinary care; vi. By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded while in the possession of SIG, and during which times employees, servants or agents of SIG had an opportunity to inspect, service and work on the gun; vii. By negligently failing to place a warning about mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of accidental discharges; viii. Other negligent acts and omissions to be developed in the course of discovery.

128.     SIG knew, or should have known, that exposing users to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries to such users, up to and including sudden death.

129.   The gun's defective condition was not visible and Elvis was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

130.   SIG' negligence as alleged in this Count directly and proximately caused the January, 2021, un-commanded discharge and Elvis' injuries resulting from the accident.

131.   As a direct and proximate result of the negligence set forth in this Count, Elvis suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, as well as medical, nursing and life care expenses for his care and treatment. These injuries are either permanent or continuing in their nature, and Elvis will suffer such losses and impairments in the future.

132.   It is stated specifically in Article 1542 of the Puerto Rico Civil Code, that people that sell a product in commerce which by its design or manufacturing is unreasonably dangerous, will be liable for the damages that such product may cause even if no intention or negligence is present.

133.   It is stated specifically in Article 1543 of the Puerto Rico Civil Code, that a product is unreasonably dangerous by its manufacturing, when the product deviates from its design or when the product does not comply with the security expectations that the ordinary consumer that uses such product for its intended purpose and use for it was obtained or an anticipated reasonable purpose or use.

134.    For the Negligence of defendants that caused plaintiff Elvis to suffer damages, defendants are liable and responsible, *in solido*, in a sum not less than TWO MILLION DOLLARS ($2,000,000.00).

## COUNT III

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

135.    Elvis readopts and re-alleges all the preceding paragraphs of this pleading as if fully set forth herein.

136.    At all relevant times, SIG was in the business of marketing, selling, and distributing weapons, including the gun causing Elvis' injuries.

137.    SIG knew of the ordinary purposes for which the gun was intended and impliedly warranted it to be of merchantable quality, safe, and fit for such purposes (which included being "vibrated" and handled while situated within and without a holster) and all other reasonably foreseeable uses.

138.    At all relevant times, Elvis used the gun in its intended manner and for its intended purpose and reasonably relied on the skill, judgment and implied warranty of SIG. SIG breached the above-referenced implied warranties as to the gun because, at the time it left SIG's possession, it was not of merchantable quality and was unreasonably dangerous and unfit for the ordinary and reasonably foreseeable purposes for which it was intended and its reasonably foreseeable misuses by virtue of: i. Failing to use due care in designing and manufacturing the P320's internal components, including its sear-striker connection, and by omitting a mechanical disconnect switch, so as to prevent un-

commanded discharges; ii. Failing to issue a mandatory recall of the P320 as SIG had done in the past with other defective products; iii. Failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge accidentally as described above; iv. Negligently failing to unambiguously warn purchasers and end users of the gun, including Elvis, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, which it knew or should have known through the exercise of ordinary care; v. Failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge accidentally while in the possession of SIG, and during which times employees, servants or agents of SIG had an opportunity to inspect, service and work on the gun; and vi. Negligently failing to place a warning about the danger of mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of accidental discharges.

139.    Elvis, as the end user of the gun, was a person who would foreseeably be injured by SIG's breach of the implied warranty referenced in this Count and SIG's breach of the warranty of merchantability as alleged herein, which breaches directly and proximately caused the accident on January 6, 2021, and Elvis' claimed injuries.

140.     As a direct and proximate result of the breaches set forth in this Count, Elvis suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, as well as medical, nursing, and life care expenses for his care and treatment. These injuries are either permanent or continuing in their nature, and Elvis will suffer such losses and impairments in the future.

## COUNT IV

## BREACH OF EXPRESS WARRANTY

141.     Elvis readopts and re-alleges all the preceding paragraphs of this Complaint as if fully set forth herein.

142.     At all times material hereto, SIG was in the business of marketing, selling, and distributing weapons, including the gun causing Elvis' injuries. Upon information and belief, SIG knew, or had reason to know, that the gun would be situated in holsters that would need to be removed from end users' waistbands at the time SIG sold the gun, and that the purchaser was in fact relying on SIG's skill, judgment, and implied warranty of the gun's fitness for that particular purpose.

143.     SIG expressly warranted that the P320 would not fire unless the trigger was pulled.

144.    At all relevant times, Elvis used the gun in its intended manner and for its intended purpose and reasonably relied on the skill, judgment and implied warranty of SIG in using and handling the gun and its SIG-issued holster.

145.    SIG breached the above-referenced express warranty as to the gun in that it fired without a trigger pull and was unreasonably dangerous at the time it left SIG's possession by virtue of: i. Failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, so as to prevent accidental discharges; ii. Failing to issue a mandatory recall of the P320 as SIG had done in the past with other defective products; iii. Failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge accidentally as described above; iv. Negligently failing to unambiguously and conspicuously warn purchasers and end users of the gun, including Elvis, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, which it knew or should have known through the exercise of ordinary care; v. Failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge accidentally while in the possession of SIG, and during which times employees, servants or agents of SIG had an opportunity to inspect, service and work on the gun; vi. Negligently failing to place a warning about the danger of mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a

36

consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of accidental discharges; and vii. Expressly warranting that the gun would not fire unless the trigger was pulled.

146.    As a direct and proximate result of the breaches set forth in this Count, Elvis suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, nursing, and life care expenses for his care and treatment. These injuries are either permanent or continuing in their nature, and Elvis will suffer such losses and impairments in the future.

## **COUNT V**

## **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

147.    Elvis readopts and re-alleges all the preceding paragraphs of this Complaint as if fully set forth herein.

148.    Upon information and belief, SIG had knowledge of serious defects in the commercial version of the P320 gun more than three years, if not longer, before Elvis was shot in January 2021.

149.    Despite having such knowledge, it failed to issue a mandatory recall of the gun despite the ability to do so, which would have prevented the severe injury to Elvis.

150.    Had SIG acted responsibly and repaired the defects in the commercial version of the P320 before and on time, Elvis never would have been shot. The round discharged from his weapon easily could have taken his life, that of any bystander near him at the time of discharge, or his father.

151.    SIG acted, and failed to act, so as to endanger the safety and lives of end users of its products because it sought to save millions in repair costs, by failing to institute a mandatory recall as it had done for other defective SIG weapons, choosing instead to implement a woefully inadequate "voluntary upgrade."

152.    SIG's conduct in this matter as described herein was extreme and outrageous such as to go beyond all possible bounds of decency, and be regarded as atrocious, and utterly intolerable in a civilized community.

153.    Through SIG's extreme and outrageous conduct, SIG intentionally or recklessly caused Elvis severe emotional distress, as well as severe and permanent physical injury.

154.    As a direct and proximate result of the breaches set forth in this Count, Elvis suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, as well as medical, nursing, and life care expenses for care and treatment. These injuries are either permanent or continuing in their nature, and Elvis will suffer such losses and impairments in the future.

155.    For the Intentional Infliction of Emotional Distress suffered by plaintiff Elvis, defendants are liable and responsible, *in solido*, in a sum not less than TWO HUNDRED AND FIFTY THOUSAND DOLLARS ($250,000.00).

## COUNT VI

## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

156.    Elvis readopts and re-alleges all the preceding paragraphs of this Complaint as if fully set forth herein.

157.    SIG owed a duty to the plaintiff, and end users of the P320 generally, to ensure that the P320 was free of design and/or manufacturing defects that could cause the gun to discharge without the trigger being pulled. SIG further owed a duty to the plaintiff, and end users of the P320 generally, to notify them of such defects in the P320 that could endanger them. In addition, SIG owed a duty to issue a mandatory recall of P320 guns, given SIG's knowledge of design and manufacturing defects imperiling the lives and safety of end users.

158.    SIG breached each its duties owed to the plaintiff, foreseeably causing the plaintiff serious mental and emotional harm accompanied by objective physical symptoms.

159.    As a direct and proximate result of the breaches set forth in this Count, Elvis suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and

embarrassment associated with the same, loss of earnings and earning capacity, as well as medical, nursing, and life care expenses for care and treatment. These injuries are either permanent or continuing in their nature, and Elvis will suffer such losses and impairments in the future.

160.     For the Negligent Infliction of Emotional Distress suffered by plaintiff Elvis, defendants are liable and responsible, *in solido*, in a sum not less than ONE HUNDRED AND FIFTY THOUSAND DOLLARS ($150,000.00).

## COUNT VII
## CONSECUENTIAL EMEREGENT DAMAGES

161. Plaintiff reproduce and reaffirm, as if alleged herein, each and every one of the preceding allegations.

162.   During the whole process of having to attend and take care of their medical necessities, Plaintiffs have incurred in medical expenses and emergent damages in a sum not less than ONE MILLION DOLLARS ($1,000,000.00).

## COUNT VIII
## (Interest, Attorneys Fees and Other Expenses)

163.   Plaintiff reproduce and reaffirm, as if alleged herein, each and every one of the preceding allegations.

164.   Pursuant to the laws of the Commonwealth of Puerto Rico, a person who is obstinate in fomenting litigation and/or protracting litigation, or refusing to recognize an obligation, is liable for reasonable attorney's fees.

165.   Pursuant to the laws of the Commonwealth of Puerto Rico, a person who is adjudged obstinate is also liable for pre-judgment interest from the date of the filing of the claim.

166.   The defendants have been obstinate in that, although they have been on notice of the nature and extent of the damages suffered by the plaintiffs, they have taken no action on the matter and have, in fact, fomented this litigation.

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiff respectfully requests that this Court:

1. Assume jurisdiction over this case;

2. Empanel a jury, and after trial, find the defendant liable for violation of the Magnuson-Moss Warranty Act, negligence, breach of implied warranty of merchantability, breach of express warranty, intentional infliction of emotional distress, and violation of N.H.R.S.A. 358-A;

3. Award the plaintiff damages for his economic losses, including but not limited to damages for lost wages, lost earning capacity, as well as medical, life care and nursing expenses;

4. Award the plaintiff compensatory damages, including but not limited to damages for physical injury, pain and suffering, emotional distress, humiliation, inconvenience and loss of enjoyment of life;

5. Award of the plaintiff of his actual damages pursuant to ARTICLES 1542, 1543 AND 1544, OF PUERTO RICO CIVIL CODE).

6. Award plaintiff costs and reasonable attorneys' fees in bringing this action;

7. Order defendant to issue a recall notice or other enhanced, unambiguous warning to all purchasers of the P320 stating that the weapon can fire without a trigger pull;

8. Retain jurisdiction over this case until defendant has complied with all orders of the Court;

9. Award such other relief as the Court deems appropriate.

The plaintiff demands a trial by jury on all counts

**WHEREFORE**, plaintiffs respectfully request that after the due proceedings this Honorable Court grants the Complaint in their favor and enters Judgment granting the remedies requested in all causes of Action and such other remedies as may be fair and equitable.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico, this 4th day of January 2022.

| /S/_ JOSÉ VLADIMIR DÍAZ-TEJERA | /S/_ RICARDO IZURIETA-ORTEGA |
|---|---|
| José Vladimir Díaz-Tejera<br>USDC-PR 208604<br>PO Box 423<br>Trujillo Alto, P.R. 00977<br>Tel 787-755-3440<br>Email:<br>diaz_tejera_lawfirm@yahoo.com | USDC-PR  124205<br>Urb. Crown Hills<br>Ave. Winston Churchill, PMB 914<br>San Juan, P.R. 0026<br>Tel. (787) 531-9419<br>E-mail:<br>izurieta.ricardo@gmail.com |