# Exhibit 19

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JIMMY S.C. JINN,

                    Plaintiff,

             - against -

SIG SAUER. INC.,

                    Defendant.

**MEMORANDUM
OPINION & ORDER**

20 Civ. 1122 (PGG) (RWL)

PAUL G. GARDEPHE, U.S.D.J.:

        In this action, Plaintiff Jimmy S.C. Jinn alleges that Defendant Sig Sauer, Inc.
designed and manufactured a firearm that unexpectedly discharged a round into Jinn's leg.  The
Complaint asserts claims for strict liability, negligence, and breach of the implied warranty of
merchantability, as well as intentional and negligent infliction of emotional distress.  (Cmplt.
(Dkt. No. 1) ¶¶ 6-8, 91-128)

        Sig Sauer has moved for summary judgment and to preclude Plaintiff's two expert
witnesses.  (Dkt. Nos. 56, 58, 60)  Jinn has moved for leave to file a video exhibit in further
opposition to Sig Sauer's motions.  (Dkt. No. 70)  On April 12, 2023, Judge Lehrburger issued a
Report & Recommendation ("R&R") recommending that Sig Sauer's motions to exclude
Plaintiff's experts and for summary judgment be granted, and that Jinn's motion to introduce the
video exhibit be denied.  (See R&R (Dkt. No. 75))  On April 26, 2023, Jinn filed objections to
Judge Lehrburger's R&R, and on May 10, 2023, Sig Sauer filed a response to Jinn's objections.
(See Pltf. Obj. (Dkt. No. 76); Def. Resp. (Dkt. No. 77))

        For the reasons stated below, Jinn's objections will be overruled, and Judge
Lehrburger's R&R will be adopted in its entirety.

# BACKGROUND[1]

## I.   FACTS[2]

At the time that Jinn was injured, he was employed by the United States

Department of Homeland Security ("DHS") as a special agent.  (R&R (Dkt. No. 75) at 2 (citing

Def. Sum. J. Br., Ex. 1 ("Def. R. 56.1 Stmt.") (Dkt. No. 61-1) ¶ 1); Def. Sum. J. Br., Ex. 4 (Dkt.

No. 61-4) at 4)[3]  In 2019, DHS issued a Sig Sauer model P320 pistol to Jinn.  As part of his

_____

[1]  The page numbers of documents referenced in this opinion correspond to the page numbers
designated by this District's Electronic Case Files ("ECF") system.

[2]  Because the parties have not objected to Judge Lehrburger's factual statement, this Court
adopts it in full.  See Silverman v. 3D Total Solutions, Inc., No. 18 Civ. 10231 (AT), 2020 WL
1285049, at *1 n.1 (S.D.N.Y. Mar. 18, 2020) ("Because the parties have not objected to the
R&R's characterization of the background facts . . . , the Court adopts the R&R's 'Background'
section and takes the facts characterized therein as true."); Hafford v. Aetna Life Ins. Co., No. 16
Civ. 4425 (VEC) (SN), 2017 WL 4083580, at *1 (S.D.N.Y. Sept. 13, 2017) ("The parties do not
object to the Magistrate Judge's . . . recitation of the facts of this case, and the Court adopts them
in full.").

[3]  To the extent that this Court relies on facts drawn from a party's Local Rule 56.1 statement, it
has done so because the opposing party has either not disputed those facts or has not done so
with citations to admissible evidence.  See Giannullo v. City of New York, 322 F.3d 139, 140
(2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving
party's Rule 56.1 statement, that fact will be deemed admitted."); Local Civ. R. 56.1(d) ("Each
statement by the movant or opponent . . . , including each statement controverting any statement
of material fact, must be followed by citation to evidence which would be admissible.").  Where
the non-moving party disputes the moving party's characterization of cited evidence, and has
presented an evidentiary basis for doing so, the Court relies on the non-moving party's
characterization of the evidence.  See Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001)
("In ruling on a motion for summary judgment, the district court must resolve all ambiguities,
and credit all factual inferences that could rationally be drawn, in favor of the party opposing
summary judgment.").

Because "a Rule 56.1 statement 'is not itself a vehicle for making factual assertions that are
otherwise unsupported in the record', . . . 'where the record does not support the assertions in a
Local 56.1 statement, those assertions [have been] disregarded and the record reviewed
independently.'"  Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona, 138 F.
Supp. 3d 352, 394 (S.D.N.Y. 2015), aff'd sub nom. Congregation Rabbinical Coll. of Tartikov,
Inc. v. Vill. of Pomona, NY, 945 F.3d 83 (2d Cir. 2019) (quoting Holtz v. Rockefeller & Co.,
Inc., 258 F.3d 62, 74 (2d Cir. 2001)).

employment, Jinn "was required to qualify [to use this firearm] on a quarterly basis." (R&R (Dkt. No. 75) at 2 (citing Def. R. 56.1 Stmt. (Dkt. No. 61-1) ¶¶ 2-3))

On July 24, 2019, Jinn participated in a "speed drill exercise" with his co-workers at the Rodman's Neck Range in the Bronx. (Id. (citing Pltf. Resp. R. 56.1 Stmt. (Dkt. No. 68) ¶ 5; Pltf. Resp. R. 56.1 Stmt., Ex. 1 ("Jinn Dep.") (Dkt. No. 68-1) at 1)) Sig Sauer "describes the speed drill exercise as a 'quick-draw speed shooting competition,' a characterization that Jinn opposes to the extent it 'implies that the plaintiff . . . was handling [his] weapon in an irresponsible fashion.'" (Id. at 2 n.2 (omission and alteration in original) (quoting Def. R. 56.1 Stmt. (Dkt. No. 61-1) ¶ 5; Pltf. Resp. R. 56.1 Stmt. (Dkt. No. 68) ¶ 5)) "In the speed drill, two participants stood on the firing line and, upon the instructor blowing a whistle, attempted to be the first to draw their pistol, fire, and hit a target." (Id. at 2 (citing Jinn Dep. (Dkt. No. 68-1) at 1)) "The first participant to hit the target remained on the firing line" to compete against the next participant. (Id. (citing Jinn Dep. (Dkt. No. 68-1) at 1)) Jinn won the first two rounds of the speed drill, but on his third round, "when pushing down on his pistol to remove it from a tight, new holster, the pistol fired one round into his leg." (Id. (citing Jinn Dep. (Dkt. No. 68-1) at 3; Def. R. 56.1 Stmt. (Dkt. No. 61-1) ¶ 9))

"The parties dispute how far out of the holster the gun was when it fired, as well as whether Jinn, or a foreign object inside the holster, actually pulled the trigger." (Id. at 3 (citing Def. R. 56.1 Stmt. (Dkt. No. 61-1) ¶¶ 13, 21, 28; Pltf. Resp. R. 56.1 Stmt. (Dkt. No. 68) ¶¶ 13, 21, 28, at 5)) "Jinn alleges that his P320, and others like it, are designed and manufactured with defects, including a faulty striker-sear connection, that allow the gun to fire un-commanded and, in fact, caused the un-commanded discharge of his pistol." (Id. (citing Pltf. Resp. R. 56.1 Stmt. (Dkt. No. 68) ¶¶ 13, 17)) Jinn further alleges that "over 80 similar incidents

3

of P320 pistols firing without a trigger pull have occurred."  (Id. (citing Pltf. Resp. R. 56.1 Stmt.

(Dkt. No. 68) ¶ 17, at 5-7))  In opposing Defendant's summary judgment motion, Jinn submitted

reports and deposition testimony from alleged experts Peter Villani and Timothy Hicks, both of

whom "identify purported defects [in the P320 pistol] and conclude that defects in the design

and/or manufacture of the P320 caused Jinn's pistol to fire without him pulling the trigger."  (Id.)

## II.    <u>PROCEDURAL HISTORY</u>

The Complaint was filed on February 10, 2020.  (Cmplt. (Dkt. No. 1))  On

February 13, 2020, this Court referred this case to Magistrate Judge Lehrburger for general

pretrial supervision.  (Dkt. No. 5)  Discovery closed on March 1, 2022.  (See (Dkt. No. 33))

On August 22, 2022, Sig Sauer moved to preclude Plaintiff's two expert witnesses

and for summary judgment.  (Def. Mots. (Dkt. Nos. 56, 58, 60))  On September 30, 2022, Jinn

moved for leave to file a video exhibit in further opposition to Sig Sauer's motions.  (Sept. 30,

2022 Pltf. Ltr. (Dkt. No. 70))  On January 25, 2023, this Court referred Sig Sauer's motions to

Judge Lehrburger for an R&R.  (Dkt. No. 72)

On April 12, 2023, Judge Lehrburger issued a forty-nine-page R&R

recommending that Sig Sauer's motions to exclude and motion for summary judgment be

granted, and that Jinn's motion to introduce the video exhibit be denied.  (See R&R (Dkt. No.

75))

In recommending that Sig Sauer's motions to exclude Plaintiff's two experts be

granted, Judge Lehrburger concludes that (1) "Villani is not qualified and that, regardless, his

opinions are unreliable"; and (2) "regardless of whether Hicks is qualified, his opinions are . . .

unreliable and should be excluded."  (R&R (Dkt. No. 75) at 8, 27)

In recommending that Sig Sauer's motion for summary judgment be granted, Judge Lehrburger finds that, "[w]ithout expert testimony, Jinn lacks evidence establishing that the P320 is not reasonably safe, that an alleged defect caused his accident, and that an alternative safer design was feasible. As a result, Jinn cannot establish any of his alleged causes of action." Judge Lehrburger further finds that, "even if the opinions of Jinn's experts were admissible, Sig [Sauer] would still be entitled to summary judgment because there is insufficient evidence to support critical elements of Jinn's claims." (Id. at 35)

Finally, Judge Lehrburger recommends that Plaintiff's motion for leave to submit a video exhibit be denied. (Id. at 46-48)

## III. JINN'S OBJECTIONS

On April 26, 2023, Jinn filed objections to Judge Lehrburger's R&R, and on May 10, 2023, Sig Sauer filed a response to Jinn's objections. (See Pltf. Obj. (Dkt. No. 76); Def. Resp. (Dkt. No. 77))

In his objections, Jinn complains that Judge Lehrburger (1) "omits any consideration of Sig [Sauer]'s August 4, 2017 press release stating that vibration, among other inertial forces, can make the P320's internal safety system fail resulting in a discharge without a trigger pull"; (2) "erroneously imposes a[n] 'identity' standard" in "discounting numerous videos and eyewitness statements of defective discharges involving the exact same gun . . . because they did not occur under the exact same circumstances"; (3) "faults Villani for not examining the Jinn holster," despite the fact that, according to Jinn, "there was no holster to inspect" because "DHS destroyed it shortly before the lawsuit"; and (4) notes that Plaintiff's experts have performed no laboratory testing of the P320, because "[l]aboratory testing of the P320 under realistic carrying conditions, with an adequate sample of P320s, is cost prohibitive and impractical under Daubert

[v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993)),] in the face of real-life replication all over the country." (Pltf. Obj. (Dkt. No. 76) at 3, 6, 12 (emphasis omitted))

## DISCUSSION

## I. LEGAL STANDARDS

### A. Review of a Magistrate Judge's Report and Recommendation

A district court reviewing a magistrate judge's report and recommendation "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). "'The district judge evaluating a magistrate judge's recommendation may adopt those portions of the recommendation, without further review, where no specific objection is made, as long as they are not clearly erroneous.'" Gilmore v. Comm'r of Soc. Sec., No. 09 Civ. 6241 (RMB) (FM), 2011 WL 611826, at *1 (S.D.N.Y. Feb. 18, 2011) (quoting Chimarev v. TD Waterhouse Inv. Servs., Inc., 280 F. Supp. 2d 208, 212 (S.D.N.Y. 2003)). A decision is "clearly erroneous" when, "upon review of the entire record, [the court is] left with the definite and firm conviction that a mistake has been committed." United States v. Snow, 462 F.3d 55, 72 (2d Cir. 2006) (quotation marks and citation omitted).

Where a timely objection has been made to a magistrate judge's recommendation, the district judge "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C). However, "[o]bjections that are 'merely perfunctory responses argued in an attempt to engage the district court in a rehashing of the same arguments set forth in the original [papers] will not suffice to invoke de novo review.'" Phillips v. Reed Grp., Ltd., 955 F. Supp. 2d 201, 211 (S.D.N.Y. 2013) (second alteration in original) (quoting Vega v. Artuz, 97 Civ. 3775 (LTS)

(JCF), 2002 WL 31174466, at *1 (S.D.N.Y. Sept. 30, 2002)). "To the extent . . . that the party . .
. simply reiterates the original arguments, [courts] will review the Report strictly for clear error."
IndyMac Bank, F.S.B. v. Nat'l Settlement Agency, Inc., 07 Civ. 6865 (LTS) (GWG), 2008 WL
4810043, at *1 (S.D.N.Y. Nov. 3, 2008) (citing Pearson-Fraser v. Bell Atl., No. 01 Civ. 2343
(WK), 2003 WL 43367, at *1 (S.D.N.Y. Jan. 6, 2003); Camardo v. Gen. Motors Hourly-Rate
Emps. Pension Plan, 806 F. Supp. 380, 382 (W.D.N.Y. 1992)); see also Ortiz v. Barkley, 558 F.
Supp. 2d 444, 451 (S.D.N.Y. 2008) ("Reviewing courts should review a report and
recommendation for clear error where objections are merely perfunctory responses, . . .
rehashing . . . the same arguments set forth in the original petition." (quotation marks and
citations omitted)).

### B. Admissibility of Expert Testimony

Pursuant to Federal Rule of Evidence 702, opinion testimony from an expert
witness who is qualified "by knowledge, skill, experience, training, or education" may be
admitted where

> (a) the expert's scientific, technical, or other specialized knowledge will help the
> trier of fact to understand the evidence or to determine a fact in issue; (b) the
> testimony is based on sufficient facts or data; (c) the testimony is the product of
> reliable principles and methods; and (d) the expert has reliably applied the
> principles and methods to the facts of the case.

Fed. R. Evid. 702.

Under Rule 702, a trial court must "'ensur[e] that an expert's testimony . . . rests
on a reliable foundation and is relevant to the task at hand.'" United States v. Williams, 506 F.3d
151, 160 (2d Cir. 2007) (quoting Daubert, 509 U.S. at 597).

> Daubert enumerated a list of factors that, while not constituting a "definitive
> checklist or test," a district court might consider in evaluating whether a proffered
> expert opinion has the required indicia of scientific reliability:  whether a theory
> or technique had been and could be tested, whether it had been subjected to peer

review, what its error rate was, and whether scientific standards existed to govern
the theory or technique's application or operation.

Nimely v. City of New York, 414 F.3d 381, 396 (2d Cir. 2005) (quoting Daubert, 509 U.S. at

593-94).

      The Supreme Court has stated that

reliability within the meaning of Rule 702 requires a sufficiently rigorous
analytical connection between that methodology and the expert's conclusions.
"[N]othing in either Daubert or the Federal Rules of Evidence requires a district
court to admit opinion evidence which is connected to existing data only by the
ipse dixit of the expert. A court may conclude that there is simply too great an
analytical gap between the data and the opinion proffered."

Id. (alteration in original) (quoting Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997)). "Thus,

when an expert opinion is based on data, a methodology, or studies that are simply inadequate to

support the conclusions reached, Daubert and Rule 702 mandate the exclusion of that unreliable

opinion testimony." Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 266 (2d Cir.

2002).

      In considering the reliability of proffered expert testimony, "the district court

should undertake a rigorous examination of the facts on which the expert relies, the method by

which the expert draws an opinion from those facts, and how the expert applies the facts and

methods to the case at hand." Id. at 267. "[I]n accordance with the liberal admissibility

standards of the Federal Rules of Evidence, only serious flaws in reasoning or methodology will

warrant exclusion." In re Fosamax Prods. Liab. Litig., 645 F. Supp. 2d 164, 173 (S.D.N.Y.

2009) (citing Amorgianos, 303 F.3d at 267). Absent such flaws, "[v]igorous cross-examination,

presentation of contrary evidence, and careful instruction on the burden of proof are the

traditional and appropriate means of attacking shaky but admissible evidence." Daubert, 509

U.S. at 596.

C.     **Summary Judgment Standard**

Summary judgment is warranted where the moving party "shows that there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. Cnty. of Nassau, 524 F.3d 160, 163 (2d Cir. 2008) (quoting Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir. 2007)). "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994) (citing Dister v. Cont'l Grp., Inc., 859 F.2d 1108, 1114 (2d Cir. 1988)). "'[T]hat opposing parties assert competing versions of the same event is not in itself sufficient to preclude summary judgment,' in that contradictory testimony only establishes a 'genuine' issue for trial if it 'lead[s] to a different legal outcome.'" Yi Fu Chen v. Spring Tailor, L.L.C., No. 14 Civ. 218 (PAE), 2015 WL 3953532, at *4 (S.D.N.Y. June 29, 2015) (alterations in original) (quoting Krynski v. Chase, 707 F. Supp. 2d 318, 322 (E.D.N.Y. 2009)).

In deciding a summary judgment motion, a court must "'resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment.'" Spinelli v. City of New York, 579 F.3d 160, 166 (2d Cir. 2009) (quoting Brown v. Henderson, 257 F.3d 246, 251 (2d Cir. 2001)). However, "'[a] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment. . . . [M]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist.'" Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (second alteration and omissions in original) (quoting Fletcher v. Atex,

Inc., 68 F.3d 1451, 1456 (2d Cir. 1995)).  "'Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment.'"  Eviner v. Eng, No. 13 Civ. 6940 (ERK), 2015 WL 4600541, at *6 (E.D.N.Y. July 29, 2015) (quoting Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir. 1996)).  A moving party can demonstrate the absence of a genuine issue of material fact "'in either of two ways:  (1) by submitting evidence that negates an essential element of the non-moving party's claim, or (2) by demonstrating that the non-moving party's evidence is insufficient to establish an essential element of the non-moving party's claim.'"  Nick's Garage, Inc. v. Progressive Cas. Ins. Co., 875 F.3d 107, 114 (2d Cir. 2017) (quoting Farid v. Smith, 850 F.2d 917, 924 (2d Cir. 1988)).

"'The principles governing admissibility of evidence do not change on a motion for summary judgment' and district courts need only consider admissible evidence in ruling on a motion for summary judgment."  I.M. v. United States, 362 F. Supp. 3d 161, 174 n.9 (S.D.N.Y. 2019) (quoting Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997)).

## II.   ANALYSIS

### A.   Sig Sauer's Motion to Exclude Plaintiff's Experts

#### 1.   The R&R's Recommendation

##### a.   Peter Villani

Since 2001, "Villani has worked as an Operations Officer, Senior Firearms Instructor/Armorer, and Primary Evidence Custodian for the United States Department of Veterans Affairs Police"; "has participated in a number of firearms training courses and has worked as a Range Manager and salesman for a gun range in the past"; and "is a certified armorer for several guns, including the Sig Sauer P320."  (R&R (Dkt. No. 75) at 8-9 (citing Def. Br., Ex. 7 (Dkt. No. 57-7)))

In his report, "Villani analyzed five P320 pistols, not including the pistol that shot Jinn." His "examination of the fifth pistol was limited to viewing photographs, as it was in evidence in another case," and his "examination of the fourth pistol was also circumscribed because it was entered into evidence in a different case." (Id. at 9 & n.6 (citing Def. Br., Ex. 5 ("Villani Report") (Dkt. No. 57-5) at 2, 10)) He first visually examined the four pistols he was able to physically access and "assigned a percentage condition based on external signs of wear," and then "'field stripped' each [firearm], made measurements of the dimensions of several components, and observed a variety of purported manufacturing and design defects."[4] He then "fired 100 rounds through the first and second pistols, disassembled them again, and observed deposits of gunpowder." (Id. at 9 (footnote omitted) (citing Villani Report (Dkt. No. 57-5) at 2, 6, 9, 10, 12)) Villani opines that "there were inconsistencies in the height of slide caps" and that "there generally 'seemed to be no consistency of dimension between the same parts between all four [P320s],' which he termed a manufacturing defect and speculated could be caused by subcontractors using different formulas in their mold injected metal ('MIM') processes." (Id. (alteration in original) (quoting Villani Report (Dkt. No. 57-5) at 13))

In the four P320 pistols that Villani physically examined, he observed that the "the MIM components were not 'finished to a tighter tolerance' and exhibited rounded areas of excess material, termed 'rollover' by Villani, which 'prevented full intended contact of the sear and striker overlaps.'" (Id. at 9-10 (quoting Villani Report (Dkt. No. 57-5) at 13)) Villani opines that "the reduced contact between components, 'with the addition of minimal movement

---

[4]  Judge Lehrburger notes that "[t]o 'field strip' a weapon is to 'dismantle or disassemble (a firearm or other piece of equipment), esp[ecially] as one would in the field rather than in a workshop.'" (R&R (Dkt. No. 75) at 9 n.7 (second alteration in original) (quoting Field-strip, OED Online, Oxford University Press, https://www.oed.com/view/Entry/287186? Redirected From=%22field+strip%22& (accessed September 12, 2023)))

of the trigger/safety level/safety lock which would cause the safety to be disengaged, could lead

to an unintended discharge.'" Villani "identifie[s] as a manufacturing defect" Sig Sauer's

"discontinu[ation] [of] the use of a safety lever return spring in its current P320 production." (Id.

at 10 (quoting Villani Report (Dkt. No. 57-5) at 13))  He concludes that

> because of "the various sizes of internal parts and [the] . . . wide range of motion
> between these parts, . . . [the P320's] 'exposure to acute conditions (e.g.[,] shock,
> vibration,[ ]heavy or repeated drops) may have a negative effect on [its] safety
> mechanisms and cause them to not work as designed.'"

(Id. (fourth alteration in original) (quoting Villani Report (Dkt. No. 57-5) at 15))

   After Jinn's pistol was recovered from DHS, Villani and Defendant's expert

Derek Watkins examined Jinn's pistol on October 28, 2021.  Villani was present for Watkins's

examination and Watkins was present for Villani's examination.  Villani then prepared a

supplemental report.[5]  (Id.; see also Villani Supp. Report (Dkt. No. 57-6) at 2-4)  During

Watkins's examination of Jinn's pistol – which Villani observed – Villani noted that Jinn's pistol

"did not have a safety lever return spring, instead relying on gravity to return the safety lever to

the 'lowered' position after the pistol is fired."  He opines that Sig Sauer's "flaw in intentionally

omitting this component . . . is that when a pistol is held in a vertical position, the safety lever

can move outwards, make contact with the safety lock, and push the safety lock upwards,

rend[er]ing it unable to stop the striker from traveling forward."  (Id. at 11-12 (citing Villani

Supp. Report (Dkt. No. 57-6) at 3-4))  "Villani did not perform any tests or calculations to

determine whether and how his theory of safety lever and lock movement would actually occur[,

however]."  (Id. at 12 (citing Def. Br., Ex. 9 ("Villani Dep.") (Dkt. No. 57-9) at 9-10))

---

[5]  The parties have not introduced any report prepared by Watkins after he and Villani examined
Jinn's P320 pistol on October 28, 2021.  The only report from Watkins that is in the record is
dated August 2, 2021, and was prepared without Watkins having had the opportunity to
physically examine Jinn's firearm.  (See Def. Br., Ex. 9 (Dkt. No. 59-9) at 2-3)

With respect to Jinn's P320 pistol, Villani notes,

> as he had with the four other P320 pistols he examined, "rollover" (excess material) on the striker foot and a rounded edge on [the] striker stop wall, which he again opines can cause reduced contact between the contact surfaces of the striker foot and sear, allowing the striker to "walk off" the sear, and also allow the safety lock tab to "jump[] over" the striker stop wall.

(Id. (second alteration in original) (quoting Villani Supp. Report (Dkt. No. 57-6) at 5-6)) Villani opines that "these two failures 'can . . . contribute' to an un-commanded discharge." (Id. (omission in original) (quoting Villani Supp. Report (Dkt. No. 57-6) at 5-6)) Villani also "observed an off-center 'drag mark' on the sear, indicating that the striker is not centered on the sear, which can further reduce the contact and cause misalignment between the striker foot and sear." The failure of the striker to center on the sear "could also lead the safety lock tab to fail, in combination with the contact surface issues." (Id. (citing Villani Supp. Report (Dkt. No. 57-6) at 7-9))

Villani concludes – "'to a reasonable degree of certainty [–] that a combination of the [discussed] defects did create a "perfect storm" scenario which led to a triggerless discharge upon inertial force and vibration on the subject gun as in many other cases involving the [P320].'" (Id. (second and third alterations in original) (quoting Villani Supp. Report (Dkt. No. 57-6) at 14)) "'[D]epending upon the condition of the individual [P320] components' status, (sear/striker engagement, excess molding material, misalignment of safety lock tab, wear, etc.), any combination of these reported designs or manufacturing defects could lead to an uncommanded discharge.'" (Id. at 12-13 (second alteration in original) (quoting Villani Supp. Report (Dkt. No. 57-6) at 15))

With respect to Villani's qualifications, Judge Lehrburger notes that Villani's "opinions in this case go much further than 'discuss[ing] the pistols that he disassembled and

13

how he found what he perceived to be worn or damaged parts.'"  (Id. at 15 (alteration in original)

(quoting Guay v. Sig Sauer, Inc., 610 F. Supp. 3d 423, 430 (D.N.H. 2022)))

> Nothing in Villani's qualifications or the content of his report[, however,] suggests [that] he has any expertise "that enables him to identify whether the cause of a problem is in fact a design or manufacturing defect versus damage from ordinary use or misuse by the owner of the gun," or to determine what effect any observed defects would have on the function of the gun.

(Id. (citation omitted) (quoting Mayes v. Sig Sauer, Inc., No. 19 Civ. 00146 (GNS) (HBB), 2023

WL 2730264, at *4 (W.D. Ky. Mar. 30, 2023), amended, 2023 WL 3854266 (W.D. Ky. June 6,

2023)))  Judge Lehrburger therefore concludes that "Villani's qualifications are insufficient to

sustain his offering opinions both on whether the P320 is defectively designed or manufactured

and on whether any purported defect or combination of defects caused Jinn's accident."  (Id. at

17)

Judge Lehrburger further concludes that "[e]ven if Villani were qualified to opine

on firearm design and manufacture, his opinions would still need to be sufficiently reliable in

order to be admissible," and Judge Lehrburger goes on to find that Villani's opinions are not

reliable.  (Id. at 17-27)

Noting that "Jinn seeks to have Villani qualified based on his experience, rather

than based on any scientific testing," Judge Lehrburger points out that

> even where an expert is qualified based on specialized experience, the expert must still "have based that opinion on sufficient facts or data, and must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts, because the trial court's gatekeeping function requires more than simply taking the expert's word for it."

(Id. at 18 (quoting Emig v. Electrolux Home Prods. Inc., No. 06 Civ. 4791 (KMK), 2008 WL

4200988, at *8 (S.D.N.Y. Sept. 11, 2008)))  And Judge Lehrburger goes on to find that "Villani

has not explained how his experience with firearms qualifies him to opine on design,

14

manufacture, and causation.  Nor has he based his opinions on sufficient facts or data, or reliably applied any experience to the facts."  (Id.)

Judge Lehrburger explains that "Villani examined [Jinn's] pistol, found rollover, and concluded that it was a defect that caused Jinn's injury without any data to support the conclusion."  Villani's opinion is thus "based on his ipse dixit alone and should be excluded." (Id. at 19)

In so concluding, Judge Lehrburger notes that Villani's lack of experience and knowledge "could have perhaps been cured by testing of his theories, but Villani conducted no such testing."  (Id. at 20)  In rejecting Jinn's argument that "any testing would have put his experts' lives at risk" (id. at 21 (citing Pltf. Opp. (Dkt. No. 67) at 19)), Judge Lehrburger notes that

> [t]hat proposition is somewhat belied by the testing performed by Sig [Sauer]'s expert, who used a cartridge loaded with putty to test whether the lateral movement of the slide assembly identified by Villani could cause the gun's internal safety mechanisms to fail, as well as vibration testing performed by Sig Sauer purporting to demonstrate that the P320 is incapable of firing without a trigger pull.

(Id. (citation omitted) (citing Villani Supp. Report (Dkt. No. 57-6) at 2-3; Def. Reply (Dkt. No. 62) at 6; id., Ex. 13 (Dkt. No. 62-13)))

Judge Lehrburger also rejects Jinn's argument that "testing is not necessary because videos of other allegedly similar incidents of triggerless discharges of P320s corroborate [Jinn's] theories."  (Id. at 22 (citing Pltf. Opp. (Dkt. No. 67) at 27-28))  Judge Lehrburger explains that "[t]he leap from the unauthenticated videos, allegedly depicting triggerless discharges of other P320s in different situations, to Villani's conclusions that Jinn's P320 was defective and that those defects caused his accident in particular, is too far for [Judge Lehrburger] to find Villani's opinions reliable."  (Id. at 23)

Judge Lehrburger also rejects Villani's argument that "testing his hypothesis would be virtually impossible" (id. (citing Villani Supp. Report (Dkt. No. 57-6) at 2)), because that argument "only demonstrates that his opinions have no reliable foundation." (Id. at 23-24) Although "testing is not an absolute [requirement for admissibility]," Judge Lehrburger notes that "[w]ithout any testing, and without any other data or analysis to support his theories that the conditions observed rendered Jinn's pistol defective and caused his accident, Villani's opinion does not pass the threshold for admissibility." (Id. at 24)

In finding Villani's opinions unreliable, Judge Lehrburger notes that, "[i]n addition to the lack of analysis supporting his rollover theory, Villani also does not tie his causation opinions sufficiently to the facts of this case." (Id. at 25) While "Villani's opinions are based on his observation of Jinn's pistol and counsel's explanation of how the accident occurred, he did not speak to Jinn or anyone else who witnessed the accident, nor did he review any materials related to the incident, [such as] DHS's report following the accident." (Id. (citing Villani Dep. (Dkt. No. 57-9) at 5-7)) "Villani also did not examine Jinn's holster, beyond viewing two largely illegible photographs." (Id. (citing Villani Dep. (Dkt. No. 57-9) at 10)) According to Judge Lehrburger, "Villani's failure to engage with and consider the circumstances of Jinn's accident further renders his opinions unreliable." (Id.)

"Also problematic is Villani's failure to identify and analyze a feasible alternative design." (Id.) Judge Lehrburger notes that – although "the Court might infer that an alternative design would be one that omits all identified defects" – "Villani performed no testing or calculations and offers no more than his own assurances to support the implication that remedying the identified defects . . . would actually reduce the likelihood of a triggerless discharge." (Id. at 25-26) Although "Jinn offers an alternative design in his briefing – the

addition of an external safety[ – ] . . . neither of Jinn's experts . . . analyze either the feasibility or efficacy of this purported alternative."  (Id. at 26 (citing Pltf. Sum. J. Opp. (Dkt. No. 69) at 9-10; Pltf. Resp. R. 56.1 Stmt. (Dkt. No. 68) ¶ 16))

In sum, Judge Lehrburger finds that "Villani fails to 'bridge the logical gap between [the] facts' of his observations and 'his conclusion' that the observed conditions of Jinn's P320 constitute product defects which caused Jinn's injury."  (Id. at 27 (alteration in original) (quoting Bocoum v. Daimler Trucks N. Am. LLC, No. 17 Civ. 7636 (JPC) (BCM), 2022 WL 902465, at *12 (S.D.N.Y. Mar. 28, 2022)))  "'This is precisely the type of opinion evidence that is connected to existing data only by the ipse dixit of the expert, which courts have held inadmissible under Rule 702 and Daubert.'"  (Id. (quoting Bocoum, 2022 WL 902465, at *12))

### b.    Timothy Hicks

Hicks "is a Professional Engineer licensed in five states and is a member of several professional associations"; "has a background in mechanical design and system evaluations, including accident reconstruction, and has 'spent close to 20 years . . . in the automotive industry, responsible for the design, manufacturing, testing, and validation of vehicle systems'"; "earned a Bachelor of Science in Mechanical Engineering from Michigan Technological University and a Master of Science in Engineering Sciences from Rensselaer Polytechnic Institute."  He also "holds Certificates of Eligibility from the California Department of Justice Bureau of Firearms and Massachusetts Firearms Records Bureau for performing firearm certification testing."  (Id. at 28 (quoting Pltf. Resp. R. 56.1 Stmt., Ex. 2 ("Hicks Report") (Dkt. No. 68-2) at 1); citing Def. Br., Ex. 5 (Dkt. No. 59-5) at 2-3))

"In forming his opinions, Hicks relied on the testing performed by Sig [Sauer]'s expert [Derek Watkins, when he and Villani examined Jinn's pistol on October 28, 2021], [Watkins's August 2, 2021 report,] [computerized tomography] scans, and Villani's observations and photographs."[6] He "did not attend or participate in the testing and examination of Jinn's

---

[6] According to Watkins's August 2, 2021 report, he is the president and chief engineer of Nth-Level LLC. (Def. Br., Ex. 9 (Dkt. No. 59-9) at 9) The record contains no other information concerning his qualifications. In his report, Watkins states that Sig Sauer examined Jinn's pistol on January 29, 2020, and that this examination was video-recorded. The opinions expressed in Watkins's report are based on his knowledge of the design of the Sig Sauer P320 pistol and his review of the video-recorded examination of Jinn's pistol. As of August 2, 2021, Watkins had not physically examined Jinn's pistol. (Id. at 3-4) According to Watkins, "[t]he pistol was a 'Post Upgrade' version and shown to be in a clean condition, with no overt damage or alterations observed. The pistol was first tested per the [following] function tests": "Magazine Catch," "Slide Catch," "Magazine Release," "Slide Release," "Trigger Function," "Disconnector Function," "Firing Pin/Striker Function," "Striker Safety Lock Function," and "Trigger Pull Actuation Force Testing." Jinn's pistol "passed all the function tests." (Id. at 2-3)

In his August 2, 2021 report, Watkins further states that

> NRA (National Rifle Association) hanging weights were employed to test the trigger actuation force of the pistol. The pistol was shown to discharge at approximately five pounds. The pistol was then field stripped, and its sub systems examined. The pistol appeared to be very clean internally, with no significant field debris observed. The trigger, trigger bar, disconnector, sear, and striker safety lever were all shown to be functioning properly. When the fire control unit was removed from the pistol and visually examined during the inspection, it was observed to be relatively clean, free of overt damage and alteration, and functioning properly. The fire control unit's components were observed to be in factory condition and the only way the pistol could be made to fire was to cock the pistol and then fully pull the trigger. No physical or empirical evidence was observed that would suggest the subject pistol was capable of discharging absent a trigger pull in a manner consistent with Mr. Jinn's complaint.

(Id. at 3)

According to Watkins, "[a]ll physical testing of the subject pistol failed to produce a discharge absent a trigger pull," and "[t]here is no physical evidence to support an allegation that the pistol fired at the time of the incident – or any other time – in any manner other than when the pistol's chamber was loaded, the striker pin was cocked, and the trigger was actuated." (Id.) Watkins concludes that "[t]he design of the S[ig] Sauer P320, combined with the video examination of the subject pistol indicates Mr. Jinn caused the trigger of the subject pistol to be pulled when he was removing the pistol from the holster." (Id. at 4)

P320[, however]; nor did he contribute to the examination or testing process." He also "did not speak with Jinn and read only two pages of his deposition." (Id. (citing Hicks Report (Dkt. No. 68-2) at 2, 9; Def. Br., Ex. 7 (Dkt. No. 59-7) 5, 9-11); see also Pltf. Opp., Ex. 7 (Dkt. No. 67-7) at 19)

According to Judge Lehrburger, "Hicks identifies essentially the same defects as Villani, without explicitly differentiating between design and manufacturing defects, and opines that '[t]hese defects explain Special Agent Jinn's report of un-commanded (no trigger pull) discharge of the firearm.'" (Id. at 28-29 (alteration in original) (quoting Hicks Report (Dkt. No. 68-2) at 3-7)) Hicks concludes,

> with "a reasonable degree of scientific and engineering certainty . . . based on engineering education, experience, and training, as well as the work conducted to date and the information available at this time" that "the physical evidence supports [Jinn's] description of the circumstances of his accident" and that "[n]ormal and expected movement and vibration while holstered can cause an accidental discharge given the defective conditions described."

(Id. at 29 (alterations and omission in original) (quoting Hicks Report (Dkt. No. 68-2) at 11))

Judge Lehrburger was "dubious about Hicks's qualifications to opine about the issues in this case," but finds that "[r]egardless of whether Hicks is qualified, his opinions, like Villani's, are not sufficiently reliable to be admitted under Fed. R. Evid. 702 and Daubert." (Id. at 32)

As to reliability, Judge Lehrburger finds that "Hicks's methodology suffers from . . . defects [similar to those seen in] Villani's," and "[f]or all the same reasons discussed regarding Villani's opinions . . . , this lack of analysis, testing, calculations, or modeling renders Hicks's testimony unreliable, regardless of his qualifications." (Id. at 33-34) Judge Lehrburger also rejects Hicks's claim that "'his investigation methods are in accordance with the generally accepted standards and practices of his field, including utilizing the scientific method.'" (Id. at

34 (quoting Hicks Report (Dkt. No. 68-2) at 1))  Judge Lehrburger notes that "'[t]here is no general acceptance in the engineering community for a methodology that omits testing of a hypothesis'" (id. (quoting Colon ex rel. Molina v. BIC USA, Inc., 199 F. Supp. 2d 53, 78 (S.D.N.Y. 2001))), and that "[w]hile Hicks 'insists in his report that he applied the scientific method in reaching his conclusions, it is . . . clear that this was not the case,' contrary to his engineering training."  (Id. (omission in original) (quoting Zsa Zsa Jewels, Inc. v. BMW of N. Am., LLC, 419 F. Supp. 3d 490, 515 (E.D.N.Y. 2019)))  Judge Lehrburger concludes that "like Villani's opinions, Hicks's opinions do not have sufficient reliability to pass through the admissibility gateway."  (Id. at 35)

### 2. Jinn's Objections to the R&R

Jinn complains that Judge Lehrburger's R&R "omits any consideration of Sig [Sauer]'s August 4, 2017 press release stating that vibration, among other inertial forces, can make the P320's internal safety system fail resulting in a discharge without a trigger pull," and that this omission constitutes "plain error."[7]  (Pltf. Obj. (Dkt. No. 76) at 3-4 (emphasis omitted))

---

[7]  The August 4, 2017 press release, entitled "SIG SAUER[] Reaffirms safety of P320[] Pistol," reads as follows:

> In response to social media rumors questioning the safety of the P320 pistol, a variant of which was selected by the U.S. government as the U.S. Army's Modular Handgun System (MHS), SIG SAUER, Inc. has full confidence in the reliability, durability and safety of its striker-fired handgun platform.  There have been zero (0) reported drop-related P320 incidents in the U.S. commercial market, with hundreds of thousands of guns delivered to date.

> The P320 meets and exceeds all U.S. standards for safety, including the American National Standards Institute (ANSI) and Sporting Arms and Ammunition Manufacturers' Institute, Inc. (SAANII), as well as rigorous testing protocols for global military and law enforcement agencies.

> All SIG SAUER pistols incorporate effective mechanical safeties to ensure they only fire when the trigger is pressed.  However, like any mechanical device, exposure to acute conditions (e.g.[,] shock, vibration, heavy or repeated drops) may have a

According to Jinn, Sig Sauer's press release "constitutes an admission by Sig [Sauer] on the central issue in the case, i.e., that the P320 as originally designed can fire without a trigger pull." (Id. at 4 (footnote omitted))

Jinn next complains that Judge Lehrburger "erroneously imposes a[n] 'identity' standard, . . . discounting numerous videos and eyewitness statements of defective discharges involving the exact same gun . . . because they did not occur under the exact same circumstances." (Id. at 6 (emphasis omitted)) Jinn contends that the R&R's finding that "[n]one of the incidents in the videos occur in similar situations to Jinn's accident" (R&R (Dkt. No. 75) at 22) is "inaccurate, and contrary to the governing New York case law," because "[a]ll the videos [proffered by Jinn] involve the exact same product – the P320 – and the circumstances, while never identical, are highly similar and involve the same alleged defect." (Pltf. Obj. (Dkt. No. 76) at 6)

Jinn also complains that the R&R "faults Villani for not examining the Jinn holster" when "there was no holster to inspect," because "DHS destroyed it shortly before the lawsuit." (Id. at 12 (emphasis omitted))

Jinn further contends that "[l]aboratory testing of the P320 under realistic carrying conditions, with an adequate sample of P320s, is cost prohibitive and impractical under Daubert

---

negative effect on these safety mechanisms and cause them to not work as designed. This language is common to owner's manuals of major handgun manufacturers.

As a result, individual attempts to perform drop tests outside of professionally controlled environments should not be attempted.

"SIG SAUER is committed to producing only the finest products," said Ron Cohen, President and CEO of SIG SAUER. "Safety and reliability have been and always will be paramount to the SIG SAUER brand."

(Pltf. Sum. J. Opp., Ex. 2 (Dkt. No. 69-2) at 1)

in the face of real-life replication all over the country." (Id. (emphasis omitted)) While the R&R

acknowledges that "testing, i.e., replication of trigger-less discharge in a lab setting, is 'not

required' under Daubert, the R[&]R essentially proceeds to require it absolutely." According to

Jinn, "it is substantially on this basis that the R[&]R excludes Villani['s] and Hicks['s]"

proffered opinions. (Id. (citation omitted) (citing R&R (Dkt. No. 75) at 24)) Jinn further argues

that "Daubert and its progeny expressly recognize that testing in some cases may be impractical

or impossible," and Jinn contends "that this is one of those cases[,] given the costs of realistic

testing that could approach seven figures, assuming it could even be done realistically with

robots." (Id. at 14 (footnote omitted)) Jinn also argues "that laboratory replication is not

necessary given the substantial evidence of real-world replication" and – referring to the press

release – asserts that "Sig [Sauer] itself has acknowledged in writing that the product can fail in

the fashion Jinn asserts." (Id.)

       Jinn's objections will be reviewed de novo. See 28 U.S.C. § 636(b)(1)(C).

**3.**      **Analysis**

       As an initial matter, Jinn errs in arguing that the R&R "omits any consideration"

of Sig Sauer's August 4, 2017 press release. (Pltf. Obj. (Dkt. No. 76) at 3 (emphasis omitted))

Indeed, Judge Lehrburger – in discussing Villani's report – quotes the Sig Sauer press release

language on which Jinn relies. (See R&R (Dkt. No. 75) at 10 (quoting Villani Report (Dkt. No.

57-5) at 15) ("[Villani] ultimately concluded that because of 'the various sizes of internal parts

and having a wide range of motion between these parts, [he] concur[s] with Sig Sauer's own

assessment . . . that "like any mechanical device,[ ]exposure to acute conditions (e.g.[,] shock,

vibration,[ ]heavy or repeated drops) may have a negative effect on these safety mechanisms and

cause them to not work as designed.""" (omission and fourth and sixth alterations in original) (emphasis added))) In sum, Judge Lehrburger clearly considered the Sig Sauer press release.

The press release is of little assistance to Jinn, however. While Jinn contends that the press release "stat[es] that vibration, among other inertial forces, can make the P320's internal safety system fail resulting in a discharge without a trigger pull" (Pltf. Obj. (Dkt. No. 76) at 3 (emphasis omitted)), the press release makes clear that an unintended discharge occurs only in "acute conditions (e.g.[,] shock, vibration, heavy or repeated drops)." After emphasizing "the reliability, durability and safety of its striker-fired handgun platform," Sig Sauer notes that "[t]here have been zero (0) reported drop-related P320 incidents in the U.S. commercial market, with hundreds of thousands of guns delivered to date," and "[t]he P320 meets and exceeds all U.S. standards for safety, . . . [and reflects] rigorous testing protocols for global military and law enforcement agencies." (Pltf. Sum. J. Opp., Ex. 2 (Dkt. No. 69-2) at 1)

The press release goes on to state that

> [a]ll SIG SAUER pistols incorporate effective mechanical safeties to ensure they only fire when the trigger is pressed. However, like any mechanical device, exposure to acute conditions (e.g.[,] shock, vibration, heavy or repeated drops) may have a negative effect on these safety mechanisms and cause them to not work as designed. This language is common to owner's manuals of major handgun manufacturers.
>
> As a result, individual attempts to perform drop tests outside of professionally controlled environments should not be attempted.

(Id.)

Jinn contends that his P320 unexpectedly discharged while he was removing it from its holster. (See Pltf. Opp. (Dkt. No. 67) at 11 ("[A] rational jury could find based on the evidence . . . that Jinn's P320, like so many others, fired without a trigger pull when he was pushing it down in his new holster before drawing it."); Pltf. Sum. J. Opp. (Dkt. No. 69) at 6-8) The circumstances of the discharge did not involve the sort of "acute conditions" cited by Sig

Sauer, whether extraordinary shock, vibration, or heavy or repeated drops. In sum, while the press release – as an evidentiary matter – constitutes an admission by Sig Sauer (see Fed. R. Evid. 801(d)(2)), it does not demonstrate that Jinn's P320 pistol spontaneously discharged under the circumstances he describes, or that P320 pistols in general spontaneously discharge under such circumstances, as Jinn contends. (See Pltf. Obj. (Dkt. No. 76) at 4 (footnote omitted) ("This statement constitutes an admission by Sig [Sauer] on the central issue in the case, i.e., that the P320 as originally designed can fire without a trigger pull.")) Finally, Sig Sauer's press release does not cure the defects in Villani's and Hicks's qualifications and methodology, which is the basis for Judge Lehrburger's recommendation that their testimony be excluded and that Sig Sauer's motion for summary judgment be granted. Accordingly, this objection will be overruled.

Jinn also complains that the R&R "erroneously imposes a[n] 'identity' standard on the issue of other similar incidents, discounting numerous videos and eyewitness statements of defective discharges involving the exact same gun . . . because they did not occur under the exact same circumstances." (Pltf. Obj. (Dkt. No. 76) at 6 (emphasis omitted))

At summary judgment, Jinn proffered five videos that he contends capture "un-commanded discharges of the P320."[8] (Pltf. Opp. (Dkt. No. 67) at 20) In reality, the videos cited by Jinn are not enlightening, because in nearly all the videos offered by Jinn, the discharge of the P320 is not shown.

---

[8] In his opposition, Jinn claims that "[a]t least six" videos depict "un-commanded discharges of the P320" pistol (Pltf. Opp. (Dkt. No. 67) at 20), but Jinn provided only five videos. (See Pltf. Resp. R. 56.1 Stmt. (Dkt. No. 68) ¶ 2, at 5; id., Exhs. 5, 7-9, 11 (Dkt. Nos. 68-5, 68-7, 68-8, 68-9, 68-11)) While Jinn references a sixth video – reflecting a March 28, 2022 incident in Houston, Texas, which Jinn states depicts a "[p]olice officer's P320 discharg[ing] as he is getting into his car" (Pltf. Opp. (Dkt. No. 67) at 22) – Jinn has not provided this video.

For example, Jinn offers February 4, 2016 body camera footage from a Roscommon, Michigan police officer. The footage depicts the officer getting out of his vehicle, followed by the sound of a gun discharging and the officer stating that his gun "[went] off." The gun itself is not visible in the video at the time of the alleged accidental discharge, however. (See Pltf. Resp. R. 56.1 Stmt., Ex. 5 (Dkt. No. 68-5))

Similarly, an August 26, 2019 video taken at a Southeastern Pennsylvania Transportation Authority ("SEPTA") train station in Philadelphia shows what appears to be footage from a police officer's body camera. The video begins with the officer reporting "an accidental discharge" of a gun, but the video does not show the discharge itself. (See Pltf. Resp. R. 56.1 Stmt., Ex. 7 (Dkt. No. 68-7))

A January 2, 2021 video from Milwaukee is security camera footage. It includes no sound. After four individuals get out of a car, they all look in the direction of one individual, who then looks towards the side of his body and then looks around the car. No gun is clearly visible, and the circumstances of what happened are not clear from the video. (See Pltf. Resp. R. 56.1 Stmt., Ex. 8 (Dkt. No. 68-8))

A December 5, 2021 video from Rose Casino in Louisiana is security camera footage. The video shows a woman moving her handbag towards what appears to be a slot machine in a casino, followed by the sound of a gun discharging. The video does not show the gun itself. (See Pltf. Resp. R. 56.1 Stmt., Ex. 11 (Dkt. No. 68-11))

Finally, an August 3, 2021 video from Saint Clare Prison in Detroit is security camera footage that includes no sound. The video shows an officer inserting a gun into his holster, making a startled movement and looking towards his holster. The video appears to show

the gun discharging in its holster. The circumstances of the firing are not clear. (See Pltf. Resp. R. 56.1 Stmt., Ex. 9 (Dkt. No. 68-9))

In sum, the videos have little probative value, because they do not clearly depict the circumstances of any alleged accidental discharge of a P320.

Jinn contends, however, that Judge Lehrburger erred in finding that "'[n]one of the incidents in the videos occur in similar situations to Jinn's accident.'" (Id. at 6 (alteration in original) (quoting R&R (Dkt. No. 75) at 22)) But it is important to acknowledge that Judge Lehrburger makes this finding in the context of discussing the reliability of Villani's opinions, and in evaluating Jinn's argument that these videos render any testing unnecessary. (See R&R (Dkt. No. 75) at 22; Pltf. Opp. (Dkt. No. 67) at 27-28) Like Judge Lehrburger, this Court considers whether Jinn's videos depict events sufficiently similar to the alleged facts here such that they render testing of Villani's conclusions unnecessary in determining whether his opinions are sufficiently reliable.

Jinn first argues that Judge Lehrburger "invades the province of the jury by asserting that it is 'impossible to determine whether the trigger was pulled'" in the February 4, 2016 Roscommon, Michigan video and in the August 26, 2019 SEPTA video, "because the 'gun is not visible when it fires.'" (Pltf. Obj. (Dkt. No. 76) at 7 (quoting R&R (Dkt. No. 75) at 22)) But a judge considering the admissibility of proposed expert testimony is required to closely examine the materials on which an expert relies. Indeed, the Second Circuit has instructed that "the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." Amorgianos, 303 F.3d at 267. Accordingly,

Judge Lehrburger did not err in noting that these videos do not show whether any trigger was pulled.

In his supplemental report, Villani "conclude[s] to a reasonable degree of certainty that a combination of . . . defects did create a 'perfect storm' scenario which led to a triggerless discharge upon inertial force and vibration on the subject gun as in many other cases involving the P[]320." (Villani Supp. Report (Dkt. No. 57-6) at 15) And Jinn argues that – although Villani "did not conduct any experiments shaking a loaded P320" – "the [spring-charged foot and sear face connection] failure has been replicated in real life many times," as shown in the videos he has proffered. (Pltf. Opp. (Dkt. No. 67) at 27-28) The videos Jinn has proffered, however, do not render testing of Villani's conclusions unnecessary, because the videos do not provide a factual basis for Villani's proffered opinions. The videos do not show how the gun in each incident came to have discharged. Indeed, as discussed above, most of the videos proffered by Jinn do not even show the discharge of a firearm. In sum, Jinn's videos do not depict circumstances similar to those here.

In his objections, Jinn complains, in particular, about Judge Lehrburger's findings concerning the February 4, 2016 Roscommon, Michigan video, and the August 26, 2019 SEPTA video. But as is explained above, in the Roscommon, Michigan video, the pistol that discharges is not visible (see Pltf. Resp. R. 56.1 Stmt., Ex. 5 (Dkt. No. 68-5)), and in the SEPTA video, the footage begins after the gun discharged. (See Pltf. Resp. R. 56.1 Stmt., Ex. 7 (Dkt. No. 68-7)) These videos are "simply inadequate to support the conclusions reached" by Villani, see Amorgianos, 303 F.3d at 266, which are (1) that a P320 discharged defectively, albeit under entirely different circumstances than those alleged here; and (2) the same defects caused each alleged defective discharge. (See Villani Supp. Report (Dkt. No. 57-6) at 15) But Jinn's videos

27

do not clearly show defective discharges, and he offers nothing to suggest that the same defects caused the discharges in each video and the discharge in this case.[9]  In sum, Jinn's videos are not proper substitutes for testing, and without other indicia of reliability, Villani's proffered expert opinions are not admissible.

Jinn next argues that the R&R "errs in stating that [the August 3, 2021 Saint Clare Prison video] shows an officer 'standing with a hand outside of the holster.'"  Jinn contends that "[t]hat is merely one still frame of the video."  (Pltf. Obj. (Dkt. No. 76) at 9 (quoting R&R (Dkt. No. 75) at 22 n.20))  According to Jinn, the Saint Clare video shows an officer "inserting [a gun] into his holster."  (Id. at 10)  As an initial matter, Jinn's contention that the officer in the video is shown "inserting [a gun] into his holster" is not inconsistent with the R&R's statement that, at another point in the Saint Clare video, the officer was "standing with a hand outside of the holster."  (R&R (Dkt. No. 75) at 22 n.20)  In any event, the circumstances of the alleged discharge at the Saint Clare Prison are not similar to the facts alleged here, where Jinn claims that his P320 discharged while he "was pushing [the gun] down, in the process of pulling it out" of his holster.  (See Jinn Dep. (Dkt. No. 68-1) at 2-3)  As such, the Saint Clare video is not a proper substitute for the testing necessary to verify the reliability of Villani's opinions.  In sum, most of the Jinn videos do not show a discharge, and "[n]one of the videos depict a P320 firing

---

[9]  Moreover, Jinn does not object to Judge Lehrburger's finding that the videos are entirely unauthenticated.  As Judge Lehrburger states, "Jinn has offered no testimony from anyone with personal knowledge of the videos or the incidents depicted to authenticate the videos."  (R&R (Dkt. No. 75) at 23)  And while Jinn cites to deposition testimony from an officer shown in one of the videos, and an affidavit from the officer's partner – both introduced in another case (see Pltf. Obj. (Dkt. No. 76) at 8; id., Exhs. 2, 3 (Dkt. Nos. 76-2, 76-3)) – neither the testimony nor the affidavit establish that the video at issue depicts what Jinn claims it depicts.  See Fed. R. Evid. 901(a).

while the user attempted to draw it from the holster." (R&R (Dkt. No. 75) at 22 n.20)
Accordingly, Jinn's objection will be overruled.

As for Jinn's complaint that the R&R "faults Villani for not examining the Jinn holster," when "DHS destroyed the holster" (Pltf. Obj. (Dkt. No. 76) at 12 (emphasis omitted)), Judge Lehrburger does not "fault" or "critici[ze]" Villani for not examining the holster, as Jinn contends. (Id.) He merely notes this fact in discussing the basis for Villani's opinions. And it is obviously relevant that Villani's proffered expert opinions are not informed by or premised on any examination of Jinn's holster. In sum, Judge Lehrburger's findings that "Villani . . . does not tie his causation opinions sufficiently to the facts of this case," and that "Villani's failure to engage with and consider the circumstances of Jinn's accident further renders his opinions unreliable" (see R&R (Dkt. No. 75) at 25) are well supported by the record.

In this regard, Judge Lehrburger notes that

> Villani's opinions are based on his observation of Jinn's pistol and counsel's explanation of how the accident occurred; he did not speak to Jinn or anyone who witnessed the accident, nor did he review any materials related to the incident, including DHS's report following the accident. . . . . Villani concludes that a combination of observed defects "did create a 'perfect storm' scenario which led to a triggerless discharge" but conceded that "[y]ou just can't tell" what combination of possible misalignments identified in his report were in fact present to cause Jinn's accident.

(Id. (alteration in original) (citations omitted) (citing Villani Dep. (Dkt. No. 57-9) at 5-7, 11; Villani Supp. Report (Dkt. No. 57-6) at 14)) Accordingly, Jinn's objection will be overruled.

Jinn also complains that while Judge Lehrburger acknowledges that "testing, i.e., replication of trigger-less discharge in a lab setting, is 'not required' under Daubert, [he] essentially proceeds to require it absolutely." According to Jinn, "it is substantially on this basis that the R[&]R excludes Villani[']s and Hicks['s]" proffered opinions. (Pltf. Obj. (Dkt. No. 76) at 12 (citation omitted) (citing R&R (Dkt. No. 75) at 24))

Testing is not an absolute prerequisite for admitting an expert opinion. See Nimely, 414 F.3d at 396 (quoting Daubert, 509 U.S. at 593-94) ("Daubert enumerated a list of factors that, while not constituting a 'definitive checklist or test,' a district court might consider in evaluating whether a proffered expert opinion has the required indicia of scientific reliability," which includes, inter alia, "whether a theory or technique had been and could be tested."). However, for a proffered expert opinion to be admissible, it must otherwise be reliable. And "'[n]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the ipse dixit of the expert.'" Id. (quoting Joiner, 522 U.S. at 146); see also Karnauskas v. Columbia Sussex Corp., No. 09 Civ. 7104 (GBD), 2012 WL 234377, at *8 (S.D.N.Y. Jan. 24, 2012) (quoting Colon ex rel. Molina, 199 F. Supp. 2d at 76) ("In design defect cases, testing, although not an absolute [prerequisite] for expert testimony to be admissible, 'is usually critical to show that an expert adhere[d] to the same standards of intellectual rigor that are demanded in their professional work.'" (second alteration in original)).

Jinn argues, however, that "the costs of realistic testing [here] could approach seven figures, assuming it could even be done realistically with robots." And according to Jinn, "laboratory replication is not necessary given the substantial evidence of real-world replication." (Pltf. Obj. (Dkt. No. 76) at 14) "Although not all expert testimony is able to be scientifically verified or examined, this lack of verification, coupled with the insufficient basis and speculation on which [Jinn's proffered expert] opinion[s] [are] based, further demonstrates that [their] opinion[s] [are] unreliable." See Ryan v. Nat'l Union Fire Ins. Co. of Pittsburgh, P.A., No. 3:03-CV-0644 (CFD), 2010 WL 2232670, at *8 (D. Conn. June 2, 2010).

Other than through ipse dixit, Jinn's proffered experts do not connect the alleged "real-world replication" data to their conclusions that Jinn's P320 pistol was defective, and that this defect led to an accidental discharge of Jinn's pistol.  (See Villani Supp. Report (Dkt. No. 57-6) at 15; Hicks Report (Dkt. No. 68-2) at 12)  The only alleged "real-world replication" data here are the same videos discussed earlier (see Pltf. Obj. (Dkt. No. 76) at 14; Pltf. Opp. (Dkt. No. 67) at 19-23), and as explained above, the videos do not show P320 handguns accidentally discharging, much less discharging under the circumstances here, where Jinn says the incident occurred when he "was pushing [the gun] down, in the process of pulling it out" of his holster. (Jinn Dep. (Dkt. No. 68-1) at 2-3)  Jinn's experts have not shown that any defect in any gun shown or referenced in the videos was also present in Jinn's pistol, or that this defect caused each discharge.  Accordingly, "'there is simply too great an analytical gap between the data'" – Jinn's videos – "'and the opinion[s] proffered'" – that Jinn's pistol discharged as a result of certain alleged defects.[10]  See Nimely, 414 F.3d at 396 (quoting Joiner, 522 U.S. at 146).  Accordingly, Jinn's objection will be overruled.[11]

For the reasons stated above, Jinn's objections regarding Judge Lehrburger's findings concerning Jinn's expert witnesses will be overruled.

---

[10]  Judge Lehrburger also finds that Villani's "qualifications . . . [are] insufficient to sustain his offering opinions both on whether the P320 is defectively designed or manufactured and on whether any purported defect or combination of defects caused Jinn's accident."  Accordingly, even if Villani's proffered opinions were reliable – which they are not – his opinions would be excluded on the independent basis of insufficient qualifications.  (R&R (Dkt. No. 75) at 8, 17)  Indeed, the R&R finds both proffered expert opinions unreliable for reasons independent from the lack of testing (see id. at 18-20, 33-35), and Jinn has not objected to these conclusions.

[11]  Jinn asks this Court to appoint an expert "to conduct laboratory testing of an adequate sample of P320s under realistic carrying conditions."  (See Pltf. Obj. (Dkt. No. 76) at 15)  Jinn has not cited law supporting his request, which is denied.

31

**B.      Sig Sauer's Motion for Summary Judgment**

  Judge Lehrburger goes on to find that Sig Sauer is entitled to summary judgment

on all of Jinn's claims:

> Without expert testimony, Jinn lacks evidence establishing that the P320 is not
> reasonably safe, that an alleged defect caused his accident, and that an alternative
> safer design was feasible.  As a result, Jinn cannot establish any of his alleged
> causes of action, and summary judgment should be entered in Sig [Sauer]'s favor
> on all claims.  But even if the opinions of Jinn's experts were admissible, Sig
> [Sauer] would still be entitled to summary judgment because there is insufficient
> evidence to support critical elements of Jinn's claims.

(R&R (Dkt. No. 75) at 35)

**1.      Products Liability and Negligence Claims**

  Judge Lehrburger concludes that "Jinn cannot prevail on a design defect theory."

(Id. at 38)  He reasons that "[n]either expert, nor Jinn's counsel, discusses or presents evidence

of the feasibility of an alternative design as required under New York law."  Rather, "Jinn merely

contends that he does not need expert testimony to establish the existence of a safer alternative

design because the existence of a safer design, namely a pistol with an external safety, is

'obvious and understandable' to a layperson."  (Id. (quoting Pltf. Sum. J. Opp. (Dkt. No. 69) at

10))  Judge Lehrburger finds this argument "unpersuasive," because "firearms are not the type of

product for which alternative designs are 'obvious and understandable.'"  (Id.)  Judge Lehrburger

further finds that "the fact that **Jinn's employer specifically requires a pistol without an**

**external safety** suggests that the alternative design championed by Jinn would not be feasible

due to lack of utility."  (Id. (emphasis in original) (citing Def. Sum. J. Reply, Ex. 2 (Dkt. 64-2) at

9))  "Even considering [Jinn's] expert reports," Judge Lehrburger finds that "Jinn has offered

nothing analyzing the utility and cost tradeoffs of his favored alternative design," and concludes that "[t]hat omission is fatal to his [products liability and negligence] claims." (Id. at 40)

Judge Lehrburger further concludes that "Jinn offers no evidence to establish a manufacturing defect claim under either" negligence or strict liability. (Id. at 41) "Even if Villani's and Hicks'[s] opinions were admissible, neither compared Jinn's P320 to any others alleged not to be defective." (Id.) "Indeed, Jinn's entire theory is one of design defect; despite using the words 'manufacturing defect,' Jinn suggests that the alleged defects in his P320 are part of a widespread problem with P320 pistols in general." (Id. at 41-42 (citing Pltf. Sum. J. Opp. (Dkt. No. 69) at 4-5; Cmplt. (Dkt. No. 1) at 2-3)) Judge Lehrburger finds that "[w]here, as here, '[a] claim [is] devoid of allegations that a particular unit differed when compared to others in the same product line[, a manufacturing defect claim] will be dismissed.'" (Id. at 42) (second and third alterations in original) (quoting Guariglia v. Procter & Gamble Co., No. 2:15-cv-04307 (ADS) (SIL), 2018 WL 1335356, at *5 (E.D.N.Y. Mar. 14, 2018))). Judge Lehrburger further finds that "[t]he exclusion of the experts' testimony identifying defects and asserting causation also supports granting summary judgment for Sig [Sauer]" because, without any such testimony, there is no evidence that any design defect caused Jinn's accident. (Id. at 43)

### 2.     Breach of Warranty of Merchantability Claim

Judge Lehrburger notes that "Jinn does not differentiate between the factual bases for any of his claims in his opposition to summary judgment," and thus concludes that "for the same reasons that Sig [Sauer] is entitled to summary judgment on Jinn's . . . products liability claims, Sig [Sauer] is entitled to summary judgment in its favor on Jinn's claim for breach of [the] implied warranty of merchantability." (Id. at 44; see also id. (quoting Nemes v. Dick's Sporting Goods, Inc., 521 F. Supp. 3d 328, 346 (S.D.N.Y. 2021)) ("'Where a plaintiff fails to submit anything in opposition to summary judgment establishing separate factual bases for their

breach of implied warranty of merchantability claims and the strict products liability claim based on defective design,[] the implied warranty claim fails alongside the design defect claim.'"))

### 3. Negligent and Intentional Infliction of Emotional Distress Claims

Judge Lehrburger finds that Jinn's negligent and intentional infliction of emotional distress claims "'seek[] damages for the same circumstances and injuries, physical and emotional, that his tort claims seek.'" (Id. at 45-46 (alteration in original) (quoting Boateng v. Bayerische Motoren Werke Aktiengesellschaft, No. 17 Civ. 00209 (KAM) (SIL), 2022 WL 4357555, at *29 (E.D.N.Y. Sept. 20, 2022)))  Because "[a] claim for emotional distress 'generally is not allowed if it is essentially duplicative of tort or contract causes of action'" (id. at 45 (quoting Djangmah v. Falcione, No. 08 Civ. 4027 (PAC) (FM), 2013 WL 208914, at *9 (S.D.N.Y. Jan. 18, 2013), report and recommendation adopted, 2013 WL 1195261 (S.D.N.Y. Mar. 25, 2013))), Judge Lehrburger finds that Sig Sauer is entitled to summary judgment on Jinn's negligent and intentional infliction of emotional distress claims.  Judge Lehrburger further finds that even where a defendant has "'potentially . . . designed, manufactured, or failed to warn of defects in a product, [such conduct] does not rise to the "outrageous" conduct or indecent behavior that a claim of [negligent or intentional infliction of emotional distress] requires.'"  (Id. at 46 (quoting Boateng, 2022 WL 4357555 at *29))

\*              \*              \*              \*

Apart from Jinn's general objection that Judge Lehrburger's R&R "omits any consideration" of Sig Sauer's August 4, 2017 press release (Pltf. Obj. (Dkt. No. 76) at 3 (emphasis omitted)), there are no objections to the R&R's recommendation that Sig Sauer's motion for summary judgment be granted.  To the extent that any of Jinn's objections apply to the portion of the R&R that discusses Sig Sauer's motion for summary judgment, they will be

overruled for the reasons set forth above.  The Court therefore reviews the remainder of the R&R for clear error.  See Gilmore, 2011 WL 611826, at *1.

This Court agrees with Judge Lehrburger that Jinn has not set forth evidence of a feasible alternative design for the P320 pistol, and has not proffered evidence of any manufacturing defect in Jinn's P320 pistol.  This Court likewise agrees that Jinn has not offered evidence sufficient to make out claims for breach of warranty of merchantability, or negligent or intentional infliction of emotional distress.  Accordingly, there is no clear error in Judge Lehrburger's recommendation that these claims be dismissed.  Accordingly, this Court will adopt the R&R's recommendation that Sig Sauer's motion for summary judgment be granted.

### C.  Jinn's Motion to File a Video Exhibit

Judge Lehrburger concludes that, "because [he] recommends granting summary judgment for Sig [Sauer] based on Jinn's lack of critical evidence, Plaintiff's later-filed motion to introduce an additional video exhibit should be denied as moot."  (R&R (Dkt. No. 75) at 46) Judge Lehrburger further states, however, that "[w]hether admitted or not, the [later-filed] video would have no effect on the Court's ultimate conclusion that Sig [Sauer] is entitled to summary judgment" because, among other reasons, "Jinn does not disclose any additional details of the circumstances surrounding th[e] alleged triggerless discharge" allegedly shown in the video.  (Id.) Judge Lehrburger also concludes that "Plaintiff's failure to authenticate the video under the Federal Rules of Evidence is reason enough to deny his motion."  (Id. at 48)  Although experts may rely on inadmissible evidence, "neither of Jinn's experts considered the additional video in forming their opinions.  Nor could they have, as the incident depicted occurred well after their

reports were submitted in this case, and Jinn has not tendered any supplemental reports from either Villani or Hicks." (Id. (citing Fed. R. Evid. 703))

No party has objected to the R&R's recommendation that Jinn's motion for leave to file the video exhibit be denied. The Court therefore reviews that recommendation for clear error. See Gilmore, 2011 WL 611826, at *1.

This Court agrees that the video exhibit that Jinn seeks to offer in further opposition to Sig Sauer's motions has not been authenticated, and that – even if the video had been authenticated – it does not support Jinn's argument that the opinions of his proffered experts are reliable, particularly given that neither of Jinn's experts viewed the video.

To the extent that Jinn argues that this video exhibit supports his opposition to Sig Sauer's motion for summary judgment, Jinn has not shown how this video constitutes evidence of his claims. Jinn represents that the video depicts "a P320 discharging inside an officer's holster in Honesdale, Pennsylvania on February 7, 2022," and contends that "it is another substantially similar incident of a triggerless discharge of a P320 from which a rational jury should be allowed to weigh and could reasonably infer from it and others that Jinn's P320 was similarly defective." (Sept. 30, 2022 Pltf. Ltr. (Dkt. No. 70) at 1) As discussed above, Jinn has not shown that there was a defect in the design or manufacture of Jinn's P320 pistol, and has not shown a breach of the warranty of merchantability or any negligent or intentional infliction of emotional distress. Jinn likewise has not shown that this video – allegedly depicting the triggerless discharge of a different P320 firearm – alters that conclusion.

Accordingly, there is no clear error in Judge Lehrburger's recommendation, and Jinn's motion for leave to file the video exhibit will be denied.

## **CONCLUSION**

For the reasons stated above, Judge Lehrburger's R&R is adopted in its entirety. Defendant's motions to preclude Plaintiff's experts and for summary judgment are granted, and Plaintiff's motion for leave to file a video exhibit is denied.

The Clerk of Court is directed to terminate the motions (Dkt. Nos. 56, 58, 60, 70), and to close this case.

Dated: New York, New York
       September 13, 2023

                    SO ORDERED.

                    Paul G. Gardephe
                    United States District Judge