# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| ELVIS RAMON GREEN BERRIOS<br>Plaintiff<br>vs.<br>SIG SAUER, INC<br>Defendant | CIVIL NO. 3: 22-CV-01002-JAG<br><br>CIVIL JURY DEMANDED |
|---|---|

## MOTION IN LIMINE TO EXCLUDE HEARSAY DOCUMENTS

TO THE HONORABLE COURT:

COMES NOW, plaintiff ELVIS RAMON GREEN BERRIOS, through the undersigning counsel, and pursuant to F.R.E 802 most respectfully moves to exclude hearsay Documents:

1. Trial on the merits is set for March 3rd of 2025 in the instant case.

2. On 7-12-2024, Parties filed the Joint Proposed Pretrial Order ("JPPO") (DKT 114), in which Defendant identified therein (at page 26), a list of documentary evidence to use at trial, which contains several documents that are inadmissible because they constitute hearsay offered to prove the truth of the matter asserted and for which no specific exceptions apply, so they should be excluded pursuant to Rule 802 of evidence. The following are the documents that were listed in the JPPO, as identified and numbered by Defendant, and a description of who prepared the document, which constitute inadmissible hearsay, herein attached as Exhibits "A" and "B":

| 6. | Police Report Card No. 2021:13-010:000060- SIG-GREEN 000226-000228 | Transcription Based on a recording of a radio transmission by Agent Ramiro Rivera at the scene from statements by Plaintiff's father |
|---|---|---|
| 24. | Police Report ---Ex. 1B to deposition of Ofc. Ramiro Rivera Fuentes | Rendered by Agent Ramiro Rivera from statements heard from Plaintiff's father during an interview. |

1

**I.  AS TO DOCUMENTS #6 & #24 OF DEFENDANT'S DOCUMENTARY EVIDENCE – POLICE CARD No. 2021:13-010:000060 & POLICE REPORT (EXHIBITS A & B):**

3. As to Documents #6 and #24 listed by Defendant in the Joint Proposed Pretrial Order (DKT 114) (POLICE CARD REPORT No. 2021:13-010:000060 AND POLICE REPORT), Plaintiff contends that they are inadmissible hearsay and should be excluded prior to Trial pursuant to Fed. Rules 802, 805 and 403 of Evidence.

4. Firstly, the "Police Card" (Doc #6 in page 26 of the JPPO) herein **attached in English and Spanish as EXHIBIT "A",** commonly known in Spanish as "Tarjeta de Querella", and the "Police Report" commonly known in Spanish as "Querella", is a document that was prepared and signed by police-officer Ramiro Rivera, made by him during the initial investigation at the scene, which was used as the basis to prepare later a Police Report (Doc. #24) known in Spanish as "Querella" (**herein attached in English and Spanish as Exhibit "B"**). The "Police Card" was later co-signed by a supervisor, police sergeant Rene Gonzalez. See attached as **Exhibit "C"**, a transcript-excerpt from the Deposition of Ramiro Rivera, dated February 1, 2023, where the Police Card is referred to as Exhibit 1A (Spanish Version) and Exhibit 1B (English translated version), and where officer Ramiro Rivera admits that he alone prepared such document, and expresses the following (Pg. 22, lines 12-25):

```
12 Q. Sir, you're taking a look at the
13 documents that have been marked Exhibit 1A and
14 1B. 1A is the Spanish language version of the
15 same document that's been translated into
16 English for 1B.
17 Have you seen the Spanish language version of
18 that document before, 1A?
19 A. Yes.
20 Q. Did you prepare that document?
21 A. Yes. I was the one that prepared the
22 document.
```

```
23 Q. Did anybody else assist in preparing that
24 document, or was it all you?
25 A. Me.
```

5. Just like in all the other judicial cases where Defendant has been sued for similar facts of a discharged weapon, also in this case Defendant conveniently claims as a defense that the firearm did not discharge itself, but that it (supposedly) was triggered accidentally by Plaintiff by "pulling" the trigger.

6. In the "Police Card" and in the "Police Report", officer Ramiro Rivera wrote in Spanish the following hearsay statement: *"INFORMA EL PERJUDICADO **ACCIONÓ** POR ACCIDENTE EL GATILLO DE SU ARMA".* However, in the English-version of such documents, conveniently translated by Defendants, such statement reads differently as follows: *"HE ACCIDENTALLY **PULLED** THE TRIGGER".* While officer Ramiro Rivera stated ambiguously in such documents that *"El PERJUDICADO"* (presumably Plaintiff) was who made the statements to him, there is an issue of fact in controversy, about whether officer Ramiro Rivera really interviewed Plaintiff Green while he was moribund on the floor, in order to prepare the "Police Card" (herein as Exhibit A) and the "Police Report" (herein as Exhibit B), or whether he interviewed Plaintiff's father, Ramon, in order to gather the assumed assertions that he wrote down on the "Police Card" and on the "Police Report", as he admitted during his deposition.

7. Nevertheless, such controversy conveniently created by Defendant is clarified during Plaintiff Green's Deposition, when he testified that he never told anyone from the police department that he accidentally pulled the trigger. See transcript-excerpt attached herein as **Exhibit "D"**), dated November 2, 2022, (pg. 63, lines 15-25 & pg. 64, lines 1-10), whereby Plaintiff expressed the following to Defendant's Counsel:

```
15 Q. So my question is, do you recall telling
16 anyone from the Puerto Rico Police Department
```

```
17 that you accidentally pulled the trigger on your
18 P320 pistol causing it to fire?
19 A. No. I didn't talk to anyone.
20 The one who spoke to the police was my dad.
21 Q. And I don't mean on the day of the
22 incident. Did you speak to the police at any
23 point after the accident?
24 A. No. They never interviewed me. They
25 even didn't call me to see how I was doing.

1 Q. So you never told anyone from the
2 Puerto Rico Police Department how the accident
3 occurred. Is that your testimony?
4 A. Yes. No one interviewed me. I didn't
5 talk to anyone.
6 Q. And up until today, you've never told
7 anyone at the Police Department how the accident
8 occurred.
9 A.  Well, at least the investigation agent
  never talked to me. Never.
```

8.   The fact that Plaintiff testified that no policeman (including officer Ramiro Rivera) ever interviewed Plaintiff to gather such assumption contained in the Police Report—that supposedly Plaintiff pulled the trigger and shot himself, is also substantiated by the testimony Plaintiff's father, Ramon, who during his deposition testified that his son was passed out from the bleeding (not being able to be interviewed about how the accident occurred), expressing the following (see transcript-excerpt attached herein as **Exhibit "E"**), dated November 3, 2022, (pg. 15, lines 13-20 & pg. 27, lines 1-10),:

```
13 Q. When you got out and found him lying
14 there what, he was still saying, "Dad, help me,"
15 or he had passed out at that time?
16 A. No. When I got out, he was already
17 passed out. So I looked out for help from the
18 neighbors, for them to help me because he could
19 die on me. He's dying on me and so I got
20 nervous.
21 Q. When you say he's dying on you,
22 what do you mean?
23 By seeing that he had bled so much, the
```

```
24 hemorrhages. And, you know, you see your son

 9 Q. At any time, from the time you first saw
10 your son until he was taken away in an
11 ambulance, did he ever regain consciousness?
12 A. No. He had no consciousness at no point
13 because there was an agent that was slapping him
14 on the face and he was going like, "Green.
15 Green. Green. It's me, Sullivan," and he did
16 not respond at any time.
```

9. As stated above in the depositions, Plaintiff was passed out on the floor and bleeding out at the scene. Thus, officer Ramiro Rivera could not have interviewed Plaintiff while moribund at the scene to draft the Police Card and the Police Report.

10. Moreover, based on the issue of fact in controversy about who was the declarant (the source of the content of the Police Card and the Police Report) who spoke to officer Ramiro Rivera to prepare such documents, the content in the documents cannot be automatically construed as an admission by Plaintiff under F.R.E 801(d)(2), so in light of this controversy, it should not be disclosed to the jury as it were an exception to hearsay.

11. These documents should be excluded because they are rather inadmissible double hearsay, as they are based on verbal statements expressed by Plaintiff's Father, Ramon (declarant) to Officer Ramiro Rivera, not declared by Plaintiff, and then posed as restatements by Officer Ramiro Rivera on the documents.  See attached as **Exhibit "F",** a transcript-excerpt from the Deposition of Ramiro Rivera, dated February 1, 2023, where he testified that the person he interviewed to draft the documents was Plaintiff's father.  (Pg. 18, lines 24-25, pg. 19, lines 1-20; Pg. 42, lines 23-25; Pg 43, lines 6-13; and Pg. 44, lines 7-16), whereby he expressed the following:

```
24 Q. Did you speak to Mr. Green's father at
25 all while you were at the scene of the incident?
 1 A. Yes.
```

5

```
2 Q. What did you discuss with Mr. Green's
3 father?
4 Since he's the one that called 911
5 system, I asked him what happened. And he said
6 that he was sleeping and that he heard a noise
7 that woke him up. So he stayed awake at that
8 moment and in a while he heard someone asking
9 for help, he heard some screams asking for help.
10 When he comes out, that's when he finds his son
11 on the floor bleeding and that's when he decided
12 to call 911 system.
13 Q. Did you speak to Mr. Green's father about
14 anything else?
15 A. Yes. As a matter of fact, since he
16 mentioned -- he had already mentioned about that
17 shot fired and I was not able to see that gun
18 around, then I asked him, "Where is that
19 firearm?" And the father said that he picked it
20 up and he brought it upstairs to the house.
```

**Pg 42- line 23-25**
```
23 Q. I'm also noticing that you took down some
24 other information or other stuff that you either
25 found, noticed, or somehow saw. Am I correct?
```

Pg 43 – line 6-13
```
6 Q. Yes. But aside from that -- sorry to
7 interrupt you. But before getting to that,
8 aside from the pistol, you jotted down other
9 information or other equipment that you found,
10 saw, or noticed.
11 A. Well, the information here is the one
12 given to me by the claimant who's Green's
13 father, Ramón.
```

**Pg 44 line 7-16**
```
7 Q. Further down in the document, after the
8 portion where you mentioned the agents that were
9 on the scene, you write down another narrative.
10 Am I correct?
11 A. Yes.
12 Q. And what is the purpose of writing this
13 additional narrative?
14 A. That is the information given to me by
15 the father who's the person that called the 911
16 system.
```

6

12. As indicated above, during his deposition on February 1st of 2023, Policeman Ramiro Rivera testified that the Police Card and the Police Report are based only on statements that he heard from Plaintiff's father, Ramon.  Thus, Agent Rivera never interviewed Plaintiff to render the Police Report, as it comes from what he heard from someone other than Plaintiff Green, also twisting .  Therefore, the documents are not admissible because they constitute double hearsay.

13. These statements by officer Ramiro Rivera in the Police Card and the Police Report constitute double hearsay that do not fall under any exception of Rule 805 of Evidence, for which there is no exception applicable to the second level of hearsay (what the policeman heard).  Rule 805 states that unless each level of hearsay falls within an exception to the hearsay rule, multiple hearsay is not admissible. Even if wrongly argued by Defendant that the statement contained in the police report were an admission by Plaintiff's father under Rule 801 (first level of hearsay heard by other than the policeman), it is still not admissible under Rule 805, because the second level of hearsay (what the policeman Rivera actually heard and then transcribed in paper) does not have an exception to the Rule.  Rule 805 makes it clear that hearsay within hearsay is not admissible unless each of the hearsay components independently satisfies an exception to the hearsay rule. See, e.g., United States v. Ruffin, 575 F.2d 346, 357 (2d Cir. 1978).

14. Nevertheless, *in arguendo*, even if the content of the documents at issue were really based on what the officer Ramiro Rivera might have heard directly from Plaintiff while he was bleeding out, passed out and moribund on the floor, the statements in the documents are still not facts that the Officer gathered "word for word" or *at verbum* from a declarant, but rather

assumptions or inferences he arbitrary derived and which words were mistranslated or twisted from the declarant's statements, as he admitted during the deposition. (See attached as **Exhibit "G",** a transcript-excerpt from the Deposition of Ramiro Rivera, dated February 1, 2023, (pg. 24, lines 11-25 and Pg. 25 lines 1-12 and Pg. 57- lines 7-23); where he corrected Defendant Counsel's twisting of the word "actioned", and he expressed:

```
12 Q. "...reports that on January 6, 2021 at 12 10:30
PM, in Sector 6536, while he was in his
13 own backyard he accidentally pulled the trigger
14 on his active weapon" –
15 A. The word used there is "actioned," but
16 yes.
17 Q. "...causing it to fire and inflicting a
18 bullet wound to his right leg with entry and
19 exit points."
20 A. Yes.
21 Q. Did you write that sentence?
22 A. Correct.
23 Q. Where did the information come from that
24 you based that sentence on?
25 A. When he told me using his own words that

1 "I shot myself unintentionally." So what I
2 assume in order for the firearm to shoot itself
3 you have to pull the trigger.
4 Q. So when you say you assume, are you
5 referring to the part where it says "he
6 accidentally pulled the trigger?"
7 A. Correct.
8 Q. So that's an assumption on your part
9 based on the fact that he said he shot himself,
10 and the only way a pistol discharges is if you
11 pull the trigger, right?
12 A. Correct.

7 You say also that you assume that the
8 bullet was activated because you assume that
9 somebody pushed the trigger, right?
10 A. Yes. You have to press the trigger in
11 order for it to shoot.
12 Q. That's what you assumed.
13 A. Yes. Because he had the pistol on his
```

```
14 hand.
15 Q. Did you mention that in your report as
16 well?
17 A. No. I didn't write that down on my
18 notes.
19 Q. Was that important, that issue, that
20 thing for you is important?
21 A. Yes.
22 Q. Nevertheless you did not place that in
23 your report, right?
24 A. No. I did not write it.
```

15. Officer Ramiro Rivera Fuentes testified that Plaintiff stated that he heard a noise and went outside of the house to investigate with his pistol in his hand. Id. 16:13-18 and 21:3-6. Also, Rivera Fuentes testified that he assumed that Green pulled the trigger, but that Green never said so. Id. 57:7-24.  Green plaintiff was not talking when Ramiro Rivera Fuentes when he arrived to the scene Deposition page 54 – line 18-25 and page 55 lines 1-4.  The report was prepared after the incident on the January 7th, 2021 morning, and Plaintiff Green denies the claim that he talked to Ramiro or any other agent at the scene.

16. The policeman Rivera cannot testify in Court either about the contents of the Police Card and the Police Report, because it is content based on hearsay, of that Plaintiff's father supposedly told him.  Therefore, The Police Card, the Police Report, and any testimony about the contents of those documents are inadmissible hearsay that should be excluded from Defendant's list of evidentiary documents for trial.

## MEMORANDUM OF LAW

17. Hearsay generally is not admissible **unless it falls within exceptions** identified by the Federal Rule of Evidence. FED. R. EVID. 802.  Double hearsay, or "hearsay included within hearsay," "is not excluded under the hearsay exception rule [Rule 802] **only if each part of the combined statements conforms with an exception** to the hearsay rule provided in

9

[the Federal Rule of Evidence]." FED. R. EVID. 805; United States v. Ortiz, 125 F.3d 630, 632 (8th Cir. 1997) (where a proffered statement constitutes "double hearsay, it "**is inadmissible unless each level of hearsay falls within an exception** to the hearsay rule").

18. The policeman's written report in this case (EXHIBIT 1) is basically a translated restatement of another person's statement, who was not even the Plaintiff, but his father. See FED. R. EVID. 805 (double hearsay "is not excluded under the hearsay rule [Rule 802] if each part of the combined statements conforms with an exception to the hearsay rule provided in [the Federal Rule of Evidence]."). So, the policeman's proffered statement contained in the police report constitutes "double hearsay, and it "is inadmissible. See Eng v Scully, 146 FRD 74, 79-80 [SDNY 1993]). The reports in question contain statements which constitute hearsay and would not be admissible absent an official report. These statements were gathered by investigators who interviewed the individuals involved in the September incident. Fed. R. Evid. 805, which permits the admittance of double hearsay if each statement conforms with an exception to the hearsay rule, taken in conjunction with the reasoning of other cases, indicates that the reports in question lack trustworthiness. Cf. Parsons v. Honeywell, Inc., 929 F.2d 901, 907 (2d Cir. 1991) (inadmissible hearsay not admissible because included in a police report). […] All persons who were interviewed in creating the reports are available to testify at trial. Only that to which the investigators themselves could testify in open court is admissible. Rule 803(8) will not be used to circumvent the hearsay rule. The reports of the Inspector General are not admissible as they contain untrustworthy double hearsay.

19. Thus a statement in a diary, for example, which recounts the hearsay statement of another person is double hearsay if it is offered for the truth of the matter asserted by the person whose statement is recorded. At the first level, it is hearsay because it is the statement

of the diarist offered to show that the other declarant made the statement attributed to him. At the second level, it is hearsay because it is the statement of the other declarant offered for the truth of what he said. Unless the plaintiffs, as proponents of the evidence, can show that the statement recounted can overcome hearsay objections at both levels, it is not admissible evidence. (Zenith Radio Corp. v Matsushita Elec. Indus. Co., 505 F Supp 1190, 1265-1266 [ED Pa 1980]).

**WHEREFORE**, plaintiff respectfully prays that pursuant to Fed Rules 802, 805 of Evidence the Honorable Court exclude from trial the following documents proposed by Defendants:

1) Police Card and the Police Report from Defendant's Documentary Evidence; and,

2) Preclude any testimony from the Police Bureau officers regarding the content of the Police Card and the Police Report.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico, on this 13th day of January of 2025.

I hereby certify that on this 13th of January 2025, I electronically filed the foregoing with the CM/ECF system which will send notifications of such filing to the counselors of record.

Attorneys for Plaintiff:

/S/  José Vladimir Díaz-Tejera

José Vladimir Díaz-Tejera
USDC-PR 208604
PO Box 483, Trujillo Alto, P.R. 00976
Tel 787-755-3440
Fax. 787- 755-0670
Email: diaz_tejera_lawfirm@yahoo.com

S/ Ricardo Izurieta-Ortega
USDC Bar No.: 124205
Ave. Winston Churchill San Juan, P.R.
Tel. 787-531-9419
Izurieta.ricardo@gmail.com

/S/  Jorge Cancio-Valdivia

Jorge Cancio-Valdivia
USDC-PR  302401
P.O. Box 367753, San Juan, P.R. 00936
Tel. (787)549-9685
E-mail: canciolaw@gmail.com

S/ Richard O. Danson, Esq. 13727 SW 152 St. Ste. 726, Miami, Florida, 33177.
Tel. 305.573.4444. E-mail: dansohlawfirm@gmail.com